> "*Following the issuance of the bonds to AHF, a continuous stream of harassment of Bent Creek began around October/November 2004, ...*". [4]

Based on this same document, the alleged events continued through 2006. I'm not certain what the period from 2002 to 2006 is purported to represent as Mr. Coma does not define it. However, an event study would require a definition of the event as well as the period over which it occurred in order to isolate the impact of the event.

It is also important to understand that Mr. Coma is taking a specific year as noted previously; i.e., 2006 and comparing it to a base year of 2002. He is not taking the average differential from the date of bond issuance, but rather is taking a single year differential and using it as his measure of annual underperformance. Mr. Coma does not justify this methodology in any way, but estimating cash flows on a one year estimate when additional information is readily available is not consistent with standard practices. A simple, and yet statistically sound measure would be a simple historical arithmetic average. Statistically, the best unbiased predictor of the future differential would be the arithmetic average of the previous years. Mr. Coma selects a single year – the worst performance year for Bent Creek – and assumes that this is the differential over all periods for the estimation of the present value. This serves to severely overstate any measured underperformance.

There is also a problem with the length of time applied to the differential. In Mr. Coma's original report, he indicates that the average life of the revenue differential is 18 years[5]. In Mr. Coma's amended report, he revises this to an average life of the revenue differential of 29 years. In both cases, he indicates that this is "the remaining term of the Bonds." Mr. Coma never states the date from which he is measuring remaining maturity, and it is difficult to ascertain given that he uses both 2006 and 2007 in his analysis. Nevertheless, I cannot replicate his estimate of remaining term on the bonds in any case.

A complication of this analysis is introduced by the staggered maturity structure of the bonds. The maturity of the bonds is set forth on Pages 27 and 28 of the Trust Indenture – Texas State Affordable Housing Corporation, as Issuer to Wells Fargo Bank Texas, N.A., as Trustee, as shown in Table 6. A staggered maturity structure serves to reduce the average maturity of the bonds. The calculation of a weighted average maturity for the bonds is presented in Table 6 based on the assumption that Mr. Coma is using December 21, 2006 as his valuation date.

Based on the information contained in the Trust Indenture, the average remaining maturity on the bonds is approximately 19.6 years if it is measured from December 31, 2006. This is almost 10 years less in remaining maturity than what is stated by Mr. Coma in his amended report. Since the longest maturity on the bonds is 30 years, it suggests that Mr. Coma is using March of 2003 as his cutoff date for measuring the remaining term. He does not provide sufficient information to understand his reasoning for doing so. But in any case, the staggered maturity structure of the bonds reduces the weighted average maturity of the bonds. Even on March 1, 2003, the weighted average maturity of the bonds was not 29 years. But, again, I do not understand the relationship between this date and the alleged events.

---

[4] Underline added to highlight timeframe provided.
[5] Page 3 of Mr. Coma's original report.

9

ACO 0000015

## Table 6.  Bond Maturities and Interest Rates

| Series | Maturity | Principal Amount | Interest Rate |
|--------|----------|------------------|---------------|
| A | 9/1/2007 | $8,385,000 | 4.05% |
| A | 9/1/2012 | $10,495,000 | 4.85% |
| A | 9/1/2022 | $32,385,000 | 5.40% |
| A | 3/1/2032 | $62,775,000 | 5.55% |
| | | | |
| A-T | 9/1/2002 | $460,000 | 3.00% |
| | | | |
| B | 3/1/2032 | $14,105,000 | 8.00% |

Total          $128,605,000

### Weighted Average Maturity
**Assuming Mr. Coma is using date from**          **12/31/2006**

| Series | Days to Maturity | Principal Amount | Weighted Days |
|--------|------------------|------------------|---------------|
| A | 241 | $8,385,000 | 15.77 |
| A | 2041 | $10,495,000 | 167.16 |
| A | 5641 | $32,385,000 | 1425.60 |
| A | 9061 | $62,775,000 | 4438.76 |
| | | | |
| A-T | Not applicable | | |
| | | | |
| B | 9061 | $14,105,000 | 997.35 |

Total          $128,145,000

**Weighted Average Maturity in Days**          **7044.63**

**Weighted Average Maturity in Years**          **19.57**

*Note:  Days to maturity and the average are calculated using 360 day year based on Article II, Section 2.2, Subsection (2) on Page 27 of the Trust Indenture.*

Using a term that was larger than the remaining average term to maturity serves to increase the present values of the cash flows that Mr. Coma is estimating.  Retaining all of his other figures (without agreeing to their validity), the impact of the difference between 19.6 years and 29 years is shown below for each of his various discount rate assumptions.  The difference is approximately $2 million which is material.

10

ACO 0000016



Figure 2. Magnitude of Term Assumption on Present Value

As noted previously, Mr. Coma is using a single year's observation to estimate the underperformance of Bent Creek. Combining this information with the assumption of a 29 year maturity indicates another serious flaw in the analysis. It appears that Mr. Coma used 29 years and the 2006 versus 2002 differential for the years in which actual information is known as well as the differential for the future years up until the final maturity of the bonds. This calculation replaces actual cash flows with an estimate based on a single year result.[6]  Using the 2006 versus 2002 annual differential as his differential estimate across all periods does not follow any standard methodology for the calculation of present value. The difference between actual and Mr. Coma's one year estimate is reflected in Figure 3. There is a large difference in the cash flow estimate over the 4 year period shown that will result in a material overestimation of Mr. Coma's underperformance present value.

---

[6] I am assuming that this is his methodology based on his use of 29 years in his present value calculations. It is not possible to have a 29 year term on the bonds in any case given the staggered maturities, but given his use of this term it is not possible that he does not use prior years (before 2006) in his calculations.

ACO 0000017

**Figure 3.  Actual versus Estimated Differential for Bent Creek**



The final issue raised by Mr. Coma's bulleted conclusion regarding the present value of the differential is Mr. Coma's selection of a discount rate.  He amends his original report by incorporating multiple rates that range from a low of 4.06% to a high of 5.09%.  According to Mr. Coma's table on Page 5 of his report, these are tax exempt discount rates.  He does not provide the source he used to obtain these interest rates, nor the effective dates for these interest rates, nor the average maturity associated with these rates, nor the type of bonds (revenue versus general obligation) that are associated with these rates, so it is impossible to independently confirm them.  Mr. Coma also does not attempt to justify the use of a range of AAA tax-exempt bond rates versus an A tax-exempt bond rate.  Thus, Mr. Coma does not provide any support for his selection of discount rates which is not common practice in present value analysis.

A well known difficulty with present value analysis is the selection of the appropriate discount rate given the large impact that this assumption has on the results.  The discount rate selected must represent the riskiness and timing of the cash flows.  Mr. Coma utilizes tax-exempt discount rates based on various credit qualities.  If one were calculating the market value of the bonds, you would use the bond cash flows and discount them using the applicable rate based on maturity and credit ratings.  But, based on his deposition, Mr. Coma is not purporting to value the bonds[7].

> *Q: Is there – in doing your valuation – is it fair to characterize what you did as a valuation of the bonds for Mr. Blanchard?*
>
> *A: I just want to be clear because there are a number of events.  What I valued was the difference between NOI on a sort of property-by-property basis, if that makes sense.  There's a difference between what the bonds are worth and having a successful transaction, if you will.*

---

[7] See Page 72, beginning on Line 3 of the videotaped, oral deposition of Stephen R. Coma.

ACO  0000018

Mr. Coma is NOT taking the cash flows to the bondholders and discounting them to obtain a bond value. So one must ask the question what is being valued before one can ascertain the appropriate rate for discounting the cash flows. Simply because AHF Community Development benefited from reduced interest rates based on both a tax-exemption and credit enhancement through MBIA, this does not mean that it is appropriate to use the tax-exempt rates reflected in Mr. Coma's report. Without attempting to provide the appropriate discount rate, it is possible to show that the selected discount rates are inappropriate.

- Mr. Coma alters his methodology in his amended report to focus on total revenues for the properties. However, the riskiness of the property cash flows is NOT the same as the riskiness of the bond cash flows. This is reflected in the following credit rating notices:

  - Standard & Poor's Ratings Services lowered its underlying[8] rating on Texas State Affordable Housing Corp.'s $114.0 million multifamily *mortgage revenue bonds* series 2002A to 'CCC' from 'B', and its standard long-term rating on the corporation's $13.9 million multifamily housing revenue bonds series 2002B to 'C' from 'CC'. *(Troubled Company Reporter, 10/19/2005)*

  - Standard&Poor's Ratings Services revised its underlying bond rating (SPUR) outlook on Texas State Affordable Housing Corp. (American Housing Foundation portfolio) to stable from negative. At the same time, Standard&Poor's affirmed its 'CCC-' SPUR on the corporation's $114 million series 2002A multifamily housing revenue bonds. The outlook revision reflects Standard&Poor's expectation that the debt service reserve fund will be available to continue to subsidize the debt service payments on the series 2002A bonds. The bonds are credit enhanced by MBIA, and will continue to have a 'AAA' standard long-term rating based on the bond insurance policy, which will remain in place for this issue. *(S&P Credit Research Abstract, dated March 26, 2007.)*

- Using a AAA credit rating or even an A credit rating to value the property cash flows is not consistent with standard practice in the selection of a discount rate that reflects the riskiness of the associated cash flows.

  - Interest rates increase as credit quality declines to reflect the increase in risk to the investor.

  - Mr. Coma application of a lower than reasonable discount rate causes the present value to be overstated.

  - *The impact of increasing the discount rate holding Mr. Coma's other assumptions constant* (29 years, $651,154.44 annual shortfall) is presented in Figure 4.

---

[8] Underlying here has the meaning of properties which are the underlying assets used to collateralize the bonds.

ACO  0000019



Figure 4.  Present Value of Shortfall in Millions of Dollars

## Conclusions

Mr. Coma fails to provide an estimate of damages.  And, given the failure to consistently apply standard financial methods, I am uncertain as to what he is actually providing.  In addition to a strict rebuttal of his conclusions, there are numerous inconsistencies and flaws in his analysis.  In general, Mr. Coma's analysis lacks transparency and/or adequate support for conclusions drawn or methodology employed and generally lacks rigor in every instance.

Mr. Coma fails to provide any justification for his selection of 2002 as the base year for comparison.  Given the methodology he employs, the selection of a base year is critical as it serves as the standard for measurement.  Why is 2002 the standard for performance measurement?  The fact that the alleged events did not occur until 2004 suggests that 2002 is an inappropriate standard if only because 2003 would be closer to the event.  It may be that Mr. Coma selected 2002 since it was the year of bond issuance, but this does not qualify it as the standard.  And since the properties deteriorated over time, the selection of 2002 would serve to overstate any underperformance resulting from the alleged events.  But, again, Mr. Coma does not provide any linkage with the alleged events at any point in his analysis.

Mr. Coma's analysis also suffers from severe oversimplification.  It is impossible to place confidence in an estimate that is calculated without the appropriate rigor.  Mr. Coma uses a single year; i.e., 2006, to project the cash flow used in the present value analysis.  He therefore assumes that a figure derived on the basis of a single year will hold over a 29 year period despite evidence to the contrary.  This approach requires one to accept that not only will Bent Creek operate at the worst level in 4 years for a 29 year period, but also that there will be no change in the performance of any of the other properties relative to Bent Creek over this 29 year period.

ACO  0000020

According to the Plaintiff's First Supplemental Rule 26(a)(2) Disclosure, Mr. Coma was offered as an expert witness specifically to address the following: *"Mr. Coma will offer expert opinions as to the Plaintiff's damages, including the damages the Plaintiff has incurred on its cross-collateralized and cross-defaulted bond at issue in this matter."* However, Mr. Coma makes no attempt to quantify damages since he makes no attempt to use any reliable principles or methods that would enable him to do so. He provides no estimate or measure of a relationship between the alleged events and the financial performance of Bent Creek Apartments. He fails to provide any accounting for confounding variables, such as but not limited to, general market conditions, management expertise, crime rates, and conversion to a low-income property. In addition, he fails to conduct sufficient analysis of the financials to ascertain any adjustments that might need to be performed to adequately account for specific issues related to Bent Creek. Therefore, it is not possible to rely on his range of estimates as damage figures.

Mr. Coma fails to identify any specific information related to Bent Creek that would contribute to its underperformance but be totally unrelated to the alleged events. Bent Creek total revenues suffer from the incomplete conversion of 48 units that were taken "offline" in 2006. Given that Bent Creek contains a total of 326 units, the "offline" units represent 15% of total units. This is information that is material to any damage calculation, and is readily available online from the Texas State Affordable Housing Corporation Board Meeting held on January 11, 2008. The excerpt from the minutes relating to American Housing Foundation are provided below.

> *TEXAS STATE AFFORDABLE HOUSING CORPORATION*
> *BOARD MEETING*
> *Friday,*
> *January 11, 2008*
>
> *Moving to American Housing Foundation, I'm basically going to just state the main concerns of the whole portfolio. Bentcreek and Creekwood are the two properties that really have a problem there. Bentcreek has 48 units that have been offline since 2006. Their corrective action was that they were to get approval from MBIA in writing to have those units converted. They wanted to convert units from one-bedroom to twos and they had to get approval of that. We still have not received that yet, so that finding remains until MBIA gives them approval to do that.*
>
> *That keeps their occupancy pretty low. They, too, have a problem with staff and keeping a staff there -- they have a high turnover. It's a large property, it's 326 units, and it's in a location in Dallas that's not one of the best locations. But they finally got a manager that's been there longer than six months, which we're proud of that.*
>
> *Creekwood is the same -- has a problem with keeping a staff, but they are trying to bring the property up. They have addressed their findings; they have responded back to what we requested of them. All of the findings in the portfolio have been closed in the American Housing.*

ACO 0000021

In his memo, Mr. Coma references his objective; i.e, to measure "the impact of Bent Creek Apartment financial underperformance on Texas State Housing Authority tax exempt bonds." Because Mr. Coma does not define what he is measuring beyond this statement, I assume that Mr. Coma is measuring the cash available for debt service since this is the cash that affects the ability of the property to support bond payments. Mr. Coma fails to follow standard practice in the development of the estimates if what he is trying to measure is cash available for debt service. Although the loan agreement required all revenues to be collected, the assumption that the present value impact of any underperformance would be measured using total revenue is simply not consistent with standard practice for estimating cash available for debt service. Mr. Coma basically acknowledges this in his deposition as follows as recorded on Page 72 of his deposition:

> *Q:  And what is that definition[9]?*
>
> *A:  In this instance, net operating income is true cash flow, so you except out depreciation, amortization and references the waterfall that's contained in the document, so true cash coming in versus true expenses going out less debt service.*

And again Mr. Coma acknowledges that total revenue is not the measure of cash available for debt service on Page 121 of his deposition:

> *Q:  So that your numbers on Page 2 of Exhibit 4 do not reflect – in the revenue and net revenue numbers, at least for 2004, and we can go back and check the other years – they do not reflect accurately actual cash available to service debt and/or for other cash expenses; is that correct?*
>
> *A:  I would say that's a fair statement.*

It is tantamount to stating that a business has no operating expenses and that all revenues are available to pay debt. Evaluating this from the extreme point of view suggests that there is no requirement to pay utilities. But if utilities are unpaid then tenants would quickly move out and total revenue would decline to zero. This is why the payment of operating expenses is actually given priority following the Rebate Fund and the Tax and Insurance Fund[10].

One simply cannot rely upon the conclusions that Mr. Coma draws in his report. He fails to provide sufficient facts or data upon which to draw reliable conclusions. For example, he provides no data regarding market conditions for the subject properties although he draws conclusions in this regard. He does not consistently and reliably apply the methods used in his analysis. For example, he does not provide justification for his discount rates nor does he provide sufficient information for an independent confirmation of the rates employed. And he does not apply the methods reliably. For example, he fails to provide a definition of the event or a definition of the timeframe over which the event occurred.

---

[9] Referring to NOI.
[10] See Pages 45 and 46 of the Trust Indenture, Section 4.4, Subsection (2) (C).

16

ACO  0000022

My report is the product of standard practices of analysis used in finance, and the conclusions I've reached are my own and are based on my training and education. The conclusions I've reached are based on the information provided as outlined in the opening of this document. These facts are simply those depended upon by Mr. Coma in the preparation of his report and sufficient to draw conclusions regarding that report. Any change in the information provided or any additional information may lead to different conclusions, and I reserve the right to amend my report accordingly.

Respectfully,

Adrian M. Cowan, Ph.D

17

ACO  0000023

# EXHIBIT "D"



City of Dallas

May 7, 2008

*Via Facsimile No. 806.373.3454*
*and First Class Mail*
John Ben Blanchard, Esquire
J. Daren Brown, Esquire
SPROUSE SHRADER SMITH, P.C.
701 South Taylor, Suite 500
Post Office Box 15008
Amarillo, Texas 79105-5008

Re:    *AHF Community Development, LLC v. City of Dallas, et al.*, Cause No.
       3:06-CV-1035-D; U.S. District Court, Northern District of Texas, Dallas Division

Dear Messrs. Blanchard and Brown:

        As you know, the City will be supplementing its expert designation to name successors to Mr. Ike Guest. I wanted to let you know that the supplemental designation will also name Sgt. Preston Gilstrap to serve as the City's employee-expert on S.A.F.E. matters in the stead of presently named employee-expert Sgt. Cynthia Parker-Ferguson. Sgt. Parker-Ferguson has, to date, provided no expert consultation services to the City's attorneys and has been provided no instruction or documents of any kind regarding her service as an expert. As Sgt. Parker-Ferguson had no personal involvement with the case and has not been provided with any instructions or documents of any kind regarding her serving as an expert witness in the case, I trust that you will want to cancel her deposition, but will await confirmation of that. Should you still desire to depose Sgt. Parker-Ferguson, to confirm the matters stated herein, please be advised that she has a previously scheduled commitment and cannot be available May 30, 2008. Should you desire to depose Sgt. Gilstrap, in his capacity as expert witness, he is presently available May 30, 2008 and is holding that date open pending some confirmation from you as to whether you desire to depose him on that date.

                            Sincerely,

                            *Victoria W. Thomas (mft)*

                            Victoria W. Thomas
                            Assistant City Attorney

VWT:tlo
L07-0156 LTR Blanchard/Brown 2008-0429



**SPROUSE SHRADER SMITH P.C.**
ATTORNEYS AT LAW

J. DAREN BROWN
(806) 468-3329

May 8, 2007

**VIA FACSIMILE: (214) 670-0622 AND REGULAR MAIL**

Victoria Thomas
OFFICE OF THE CITY ATTORNEY
7BN Dallas City Hall
1500 Marilla Street
Dallas, Texas 75201

Re:     Cause No. 3-06 CV 1035D; *AHF Community Development, L.L.C. v. City of
        Dallas, et al.;* U.S. District Court, Northern District of Texas, Dallas Division

Dear Ms. Thomas:

        We are in receipt of your letter dated May 7, 2008 wherein you indicated that you would
be supplementing your expert designation to name the successor of Mr. Ike Guest. As we have
previously agreed, due to Mr. Guest's untimely death, that is acceptable to us at this time.
However, regarding the supplemental designation of Sgt. Preston Gilstrap to serve as the City's
employee expert on SAFE team matters, we cannot agree to allow you to supplement Sgt.
Gilstrap in place of Sgt. Cynthia Parker Ferguson. The expert designation deadline which we
previously agreed to move from June 2007 to October 31, 2007 is well passed.

        Additionally, we understand that Sgt. Parker Ferguson cannot be available May 30, 2008,
however, we are still determining whether we will need to depose her at a later date because of
her position as Sergeant of the SAFE Team.

        If you would like to further discuss these matters, please do not hesitate to contact John
Ben or myself at your earliest convenience.

                                        Sincerely,

                                        J. Daren Brown

JDB/ap
cc:     John Ben Blanchard
478807_1 DOC
0567.450

701 S. TAYLOR, SUITE 500 · P.O. BOX 15008 · AMARILLO, TEXAS 79105-5008
daren.brown@sprouselaw.com · PHONE (806) 468-3300 · FAX (806) 373-3454 · sprouselaw.com

# EXHIBIT "E"

## Thomas, Victoria

| | |
|---|---|
| **From:** | Thomas, Victoria |
| **Sent:** | Tuesday, August 05, 2008 5:29 PM |
| **To:** | 'Daren Brown' |
| **Cc:** | Haskel, Peter; Caso, Chris; Weir, Daniel |
| **Subject:** | RE: AHF v City Amended Designation of Experts |

Good afternoon, Daren

Thank you for your email below. As AHF has no objection, I will prepare a motion to amend the scheduling order to extend the motion deadline to October 31, 2008. Additionally, I have resolved my prior scheduling conflict and can now agree to the conclusion of Dr. Lacefield's deposition on September 8, 2008. We will prepare a notice and forward it to you to accept on behalf of Dr. Lacefield.

Having just received your email, I have attempted to ascertain when the City's outstanding expert reports can be ready. As you know, even after locating experts to replace Mr. Guest, which in itself was not an easy task given that the multiple areas of expertise involved in the service he was providing, there was then a voluminous amount of financial and factual information to be accumulated, transmitted, and reviewed and analyzed by the experts. As you also know, during that time, we have continued to receive, piecemeal, the financial information requested from AHF and required for a thorough analysis, particularly as to financial information for recent years and for affiliated entities. In fact, to date, we still have not received the documents promised during the deposition of Mr. Coma, AHF's financial expert. Obviously, our experts cannot be expected to complete their reports without those documents. Assuming those documents are received within the next 3 days, the City's experts anticipate producing reports by August 20, 2008.

As I said in my earlier email to you, the City appreciates your understanding in the face of the unfortunate and untimely passing of the City's forensic financial expert, Ike Guest, as we have worked to locate and bring up to speed successor experts for Mr. Guest. Given that less than two weeks will remain for discovery after the provision of the reports of these experts, we are, of course, more than happy to work with you in scheduling their depositions beyond that discovery deadline.

Best regards,

Victoria

Victoria W. Thomas
Assistant City Attorney
Dallas City Attorney's Office
1500 Marilla Street, Room 7CN
Dallas, Texas 75201

214.670.4308
214.670.0622 (Fax)



PRIVILEGED AND CONFIDENTIAL LEGAL COMMUNICATION

This communication, including any attachments, is intended solely for the addressee(s) named above and may contain confidential and legally privileged information. Unauthorized use, disclosure, or copying is prohibited. If you have received this communication in error, please notify the sender immediately by replying to this communication and then delete it from your system. This communication contains the thoughts of the sender and does not represent official policy of the City of Dallas unless the communication specifically so states.

---

**From:** Daren Brown [mailto:daren.brown@sprouselaw.com]
**Sent:** Friday, August 01, 2008 3:52 PM
**To:** Thomas, Victoria
**Cc:** John Ben Blanchard; Shawn Twing; Christy Dement; Dell Milam
**Subject:** RE: AHF v City Amended Designation of Experts

Victoria:

Good afternoon. In response to your e-mail below, if the City believes it is necessary to extend the deadlines from September 30, 2008 to October 31, 2008 as related to the summary judgment motions and "all other motions" deadlines, we would not oppose the motion if filed by the City. Second, with regard to Ike Guest's replacement, it has been almost 4 months since the passing of Mr. Guest and we believe there has been enough time to find a replacement for Mr. Guest. We have tried to be accommodating to the City in allowing additional time for the City to locate a replacement for Mr. Guest. However, this continued delay in designating an expert and providing us with the expert's opinions and written report is impeding our ability to effectively evaluate and prosecute this case. Therefore, we request that the City provide us with the amended 26(a)(2) disclosures related to Mr. Guest's replacement and any reports drafted by this expert by next Friday, August 8, 2008 at 5:00 p.m. Otherwise, we intend to object to the untimely designation of this expert in this litigation.

J. Daren Brown

Sprouse Shrader Smith P.C.

701 S. Taylor, Suite 500

P.O. Box 15008

Amarillo, Texas 79105

Phone (806) 468-3300

Direct Dial (806) 468-3329

Fax (806) 373-3454

E-mail: daren.brown@sprouselaw.com

9/29/2008

CONFIDENTIALITY NOTICE. This transmission and the accompanying documents or attachments contain confidential information belonging to the sender which is legally privileged. The information is intended only for the use of the individual or entity named as recipient above, and may contain attorney-client communications. If you are not the intended recipient or have received this transmission in error, please reply to the sender and destroy all copies of the transmission. If you are unable to reply via e-mail, please contact Sprouse Shrader Smith P.C. at (806) 468-3300. Any disclosure, copying, distribution or taking of action in reliance on the contents of this transmission by unintended recipients is strictly prohibited.

**From:** Thomas, Victoria [mailto:victoria.thomas@dallascityhall.com]
**Sent:** Wednesday, July 30, 2008 10:12 AM
**To:** Daren Brown
**Subject:** AHF v City Amended Designation of Experts

Good morning, Daren,
The City has secured the services of successor experts for Ike Guest but we do not have reports from them yet.
While the reports are generally supposed to be provided with the designation, because of time constraints, with your agreement that we can provide the reports later, I can go ahead and provide you with an Amended Designation of Expert Witnesses identifying those experts which would allow you to at least set some times for depositions of those experts. (I am in the process now of getting estimates from the experts regarding when their reports will be ready and can also let you know that as soon as I find out.)

If, because of prior scheduling conflicts of counsel or the experts, it is not possible for you to conduct the depositions of these experts before the discovery deadline, we would, of course, agree to your taking of those depositions beyond that date with one caveat, particularly since your email to me earlier today indicated that we will have to conduct the continuation of Dr. Lacefield's deposition beyond the discovery deadline to accommodate his schedule. The caveat is this -- conducting any depositions beyond the discovery deadline necessitates a concommitant enlargement of the time for filing motions. If you are agreeable, perhaps we could identify and agree to the depositions that may need to be conducted beyond the discovery deadline and agree to a limited extension – that is, an extension of discovery just for the taking of those depositions – and an extension of similar length of the motion deadline. I do not believe there would be any need to affect the trial date.

As for the September 8 date that Dr. Lacefield is available, I have a scheduling conflict but I may be able to work it out so I will let you know on that as soon as I determine if it can be worked out.

Thank you.
Victoria

Victoria W. Thomas
Assistant City Attorney
Dallas City Attorney's Office
1500 Marilla Street, Room 7CN
Dallas, Texas 75201
214.670.4308
214.670.0622 (Fax)



PRIVILEGED AND CONFIDENTIAL LEGAL COMMUNICATION

This communication, including any attachments, is intended solely for the addressee(s) named above and may contain confidential and legally privileged information. Unauthorized use, disclosure, or copying is prohibited.  If you have received this communication in error, please notify the sender immediately by replying to this communication and then delete it from your system.  This communication contains the thoughts of the sender and does not represent official policy of the City of Dallas unless the communication specifically so states.

The information contained in this e-mail message may be privileged, confidential, and protected from disclosure. If you are not the intended recipient, any dissemination, distribution, or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender by return e-mail and delete all copies of this message.

In accordance with IRS' Circular 230, this advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding tax penalties.

9/29/2008

# EXHIBIT "F"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| AHF COMMUNITY DEVELOPMENT, L.L.C., **Plaintiff,** | § § § § | |
| v. | § § | CIVIL ACTION NO. 3-06-CV-1035-D ECF |
| CITY OF DALLAS, et al., **Defendants.** | § § § | |

### AFFIDAVIT OF VICTORIA W. THOMAS

BEFORE ME, the undersigned authority, personally appeared Laura Ross, who, being by me duly sworn, deposed as follows:

1.      My name is Victoria W. Thomas and I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein.

2.      I am an Assistant City Attorney for the City of Dallas and am counsel of record for the Defendants in this case.

3.      On August 11, 2008, I was informed that  James Isaac "Ike" Guest, the Defendants' financial expert in this case, had suddenly and unexpectedly passed away.

4.      With the assistance of Mr. Pete Haskel, Chief of General Litigation for the Dallas City Attorney's Office,  and others within the Dallas City Attorney's office, I began work immediately to locate and retain a replacement expert or experts and worked diligently once those experts were  identified and retained, to facilitate their review of the massive amounts of financial information required for their analysis and rendering of reports, keeping Plaintiff periodically updated on the status.

5.      Within days of learning of Mr. Guest's death, Mr. Haskel and I, along with several other attorneys from the Dallas City Attorney's Office, met with Joe Moore and Wanda Lorenz, both  with the firm at which Mr. Guest had been a partner.  Our hope was to rely on that

firm to provide a successor expert, but I reluctantly reached the conclusion that while the remaining members of the firm were highly professional accountants, they did not provide the precise attributes the Defendants needed for their financial experts.

6.      Thereafter, on behalf of Defendants and with Mr. Haskel's assistance, I entered into extended, in-depth discussions with a member of the Weaver and Tidwell accounting firm, providing documents for review, arranging for Weaver and Tidwell to obtain Mr. Guest's working papers, facilitating meetings with Mr. Guest's firm, and beginning the paperwork required for approval of the expert contract by the Dallas City Council.  However, a conflict unexpectedly arose in the middle of those efforts caused by business discussions that Weaver and Tidwell was having with a third-party.

7.      With the assistance of Mr. Haskel, I continued to search for one or more successor experts to replace Mr. Guest and by mid-May of 2008 had made contact with both Don Southerland, C.P.A. and Dr. Adrian Cowan.  I believed that together Southerland and Cowan could provide the expertise required to succeed Mr. Guest.  Even before conclusion of the somewhat lengthy process of securing Dallas City Council approval of their contracts for rendition of expert services, those experts began work on reviewing the enormous financial information at issue in this case to render reports.  Both Southerland and Cowan were at work digesting and analyzing the financial information before the end of May, 2008.

8.      Southerland and Cowan reported to me that their progress was slowed to a significant extent because documents relied upon by Plaintiff's financial expert Steve Coma were produced piecemeal by Plaintiff throughout this time.  For instance, although Mr. Coma relied on the 2007 audited financial statements for the 13 apartment complexes involved in the cross-collateralized bond issue involving Plaintiff and despite Defendants' requests for those documents, they were not provided until July 10, 2008.

9.      Additionally, I encountered problems with obtaining other information needed by Southerland and Cowan that had previously been requested from Plaintiff, including monthly rent rolls and year end occupancy reports for the apartment complexes.  I also ran into difficulties when one of the data disks retrieved from Mr. Guest's firm was revealed to be corrupted, requiring that I request and obtain a replacement for the corrupted disk from Plaintiff.

This the 29th day of September, 2008.

_____
Victoria W. Thomas

Before me, the undersigned Notary Public, on this day personally appeared VICTORIA W. THOMAS, who, after being duly sworn, stated under oath that she has read the above affidavit and that every statement contained therein is within her personal knowledge and is true and correct.  SWORN TO AND SUBSCRIBED before me and given under my hand and seal of office this on the ___29th___ day of September, 2008.

TERI L. O'GORMAN
Notary Public, State of Texas
My Commission Expires
May 13, 2011

_____
NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

# EXHIBIT "G"

Case 3:06-cv-01035-D   Document 175-3   Filed 09/29/08   Page 23 of 74   PageID 1381

## Thomas, Victoria

| | |
|---|---|
| **From:** | Thomas, Victoria |
| **Sent:** | Wednesday, April 23, 2008 4:27 PM |
| **To:** | Daren Brown; John Ben Blanchard |
| **Cc:** | Haskel, Peter; Caso, Chris; Reilly, Chris; Weir, Daniel; Treece, Martha; Vaughn, Demarcus |
| **Subject:** | AHF v. COD |

Good afternoon, gentlemen,

I wanted to let you know that Ike Guest's former firm has confirmed that they received a working disc of the auditor's work papers today.  I believe this may be the last of the documents that Mr. Guest had requested as necessary for the completion of his report (with the  possible exception of similar papers regarding American Housing Foundation).  At any rate, I very much appreciate your continued efforts in getting this information for us.

We are continuing to work on engaging expert(s) to continue and carry forward with Mr. Guest's expert services for the City in this case.  Pete Haskel and I expect to be in contact with you soon, likely sometime next week, to give you a status report.   In the meantime, I just wanted to confirm that, despite our earlier agreement that Mr. Guest would provide his report within two to three weeks of receiving the last of the papers he required, in view of his untimely death, we are obviously not able to meet that deadline.  You have both graciously expressed your understanding and willingness to work with us as we attempt to locate and bring up to speed a replacement for Mr. Guest.   Thus,  while I do not believe you would attempt to press for that deadline, I wanted to just assure you that we are working diligently to move the matter forward and we will be in touch next week regarding timing and deadlines going forward.

Thank you.

Victoria

Victoria W. Thomas
Assistant City Attorney
Dallas City Attorney's Office
1500 Marilla Street, Room 7CN
Dallas, Texas 75201
214.670.4308
214.670.0622 (Fax)



9/27/2008

PRIVILEGED AND CONFIDENTIAL LEGAL COMMUNICATION

This communication, including any attachments, is intended solely for the addressee(s) named above and may contain confidential and legally privileged information. Unauthorized use, disclosure, or copying is prohibited.  If you have received this communication in error, please notify the sender immediately by replying to this communication and then delete it from your system.  This communication contains the thoughts of the sender and does not represent official policy of the City of Dallas unless the communication specifically so states.

9/27/2008



City of Dallas

May 7, 2008

*Via Facsimile No. 806.373.3454*
*and First Class Mail*
John Ben Blanchard, Esquire
J. Daren Brown, Esquire
SPROUSE SHRADER SMITH, P.C.
701 South Taylor, Suite 500
Post Office Box 15008
Amarillo, Texas 79105-5008

Re:   *AHF Community Development, LLC v. City of Dallas, et al.*, Cause No.
      3:06-CV-1035-D; U.S. District Court, Northern District of Texas, Dallas Division

Dear Messrs. Blanchard and Brown:

        As you know, the City will be supplementing its expert designation to name
successors to Mr. Ike Guest. I wanted to let you know that the supplemental designation
will also name Sgt. Preston Gilstrap to serve as the City's employee-expert on S.A.F.E.
matters in the stead of presently named employee-expert Sgt. Cynthia Parker-Ferguson.
Sgt. Parker-Ferguson has, to date, provided no expert consultation services to the City's
attorneys and has been provided no instruction or documents of any kind regarding her
service as an expert. As Sgt. Parker-Ferguson had no personal involvement with the case
and has not been provided with any instructions or documents of any kind regarding her
serving as an expert witness in the case, I trust that you will want to cancel her
deposition, but will await confirmation of that. Should you still desire to depose Sgt.
Parker-Ferguson, to confirm the matters stated herein, please be advised that she has a
previously scheduled commitment and cannot be available May 30, 2008. Should you
desire to depose Sgt. Gilstrap, in his capacity as expert witness, he is presently available
May 30, 2008 and is holding that date open pending some confirmation from you as to
whether you desire to depose him on that date.

                                                Sincerely,

                                                *Victoria W. Thomas (mft)*

                                                Victoria W. Thomas
                                                Assistant City Attorney

VWT:tlo
L07-0156 LTR Blanchard/Brown 2008-0429

## Thomas, Victoria

| | |
|---|---|
| **From:** | John Ben Blanchard [johnben.blanchard@sprouselaw.com] |
| **Sent:** | Monday, May 19, 2008 10:41 AM |
| **To:** | Thomas, Victoria; Daren Brown |
| **Cc:** | Haskel, Peter; Weir, Daniel; Caso, Chris; Reilly, Chris |
| **Subject:** | RE: AHF - Scheduling and Trial Dates |

Victoria: I just spoke to my client regarding your proposed modification of the scheduling order. My client will not oppose a motion to modify/extend on the terms set forth in your email, below.

John Ben Blanchard
Sprouse Shrader Smith P.C.
P.O. Box 15008
Amarillo, Texas 79105-5008
Direct: 806.468.3304
Fax: 806.373.3454
Cell: 806.584.5464
email: johnben.blanchard@sprouselaw.com

---

**From:** Thomas, Victoria [mailto:victoria.thomas@dallascityhall.com]
**Sent:** Friday, May 16, 2008 2:21 PM
**To:** John Ben Blanchard; Daren Brown
**Cc:** Haskel, Peter; Weir, Daniel; Caso, Chris; Reilly, Chris
**Subject:** AHF - Scheduling and Trial Dates
**Importance:** High

Good afternoon, Gentlemen,

The City is continuing its diligent efforts to locate and secure the services of qualified substitute expert witnesses for Mr. Ike Guest. As you can imagine, however, potential conflicts for a large, municipal client make this a more difficult task than it would perhaps ordinarily be. Nevertheless, we believe we are close to being able to designate successors. However, if we are able to designate within the next week, we will still need ample time for those experts to review and digest the voluminous documentary information produced to date and render reports and, of course, then proceed with depositions for which those experts are needed. Eight to ten weeks at a minimum would be needed for the review of the documents and preparation of reports. And I believe we can expect, as we have seen in this case to date, that accommodating the busy schedules of several expert witnesses and counsel for depositions will require some time as well.

Thus, it appears that we will need to ask the Court to revise the Scheduling Order to allow discovery to proceed beyond the present deadline, at least as to depositions where these experts are required, and to concurrently extend the motion deadline so that the deposition testimony of these experts will be available for use in motions. As trial is presently set for November 3, 2008, this would also seem to require a resetting of the trial date. We would like to propose to the Court a discovery deadline of August 31, 2008, a motion deadline of September 30, 2008, and request that the Court reset the case for trial at the earliest available

setting after the November 3, 2008 docket. The Defendants are anxious, as I am sure your client is also, to see this matter swiftly concluded. However, given the untimely death of Mr. Guest, even working as we are now with all due haste, given the size of the case, as evidenced by the volume of discovery conducted to date, this brief delay seems reasonable and unavoidable.

Please let me know if you have any objection or, if you wish to discuss the matter further, please feel free to contact me.

Thank you.

Victoria

Victoria W. Thomas
Assistant City Attorney
Dallas City Attorney's Office
1500 Marilla Street, Room 7CN
Dallas, Texas 75201
214.670.4308
214.670.0622 (Fax)



PRIVILEGED AND CONFIDENTIAL LEGAL COMMUNICATION

This communication, including any attachments, is intended solely for the addressee(s) named above and may contain confidential and legally privileged information. Unauthorized use, disclosure, or copying is prohibited. If you have received this communication in error, please notify the sender immediately by replying to this communication and then delete it from your system. This communication contains the thoughts of the sender and does not represent official policy of the City of Dallas unless the communication specifically so states.

The information contained in this e-mail message may be privileged, confidential, and protected from disclosure. If you are not the intended recipient, any dissemination, distribution, or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender by return e-mail and delete all copies of this message.

In accordance with IRS' Circular 230, this advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding tax penalties.

9/27/2008

## Thomas, Victoria

**From:**   Thomas, Victoria
**Sent:**   Wednesday, July 30, 2008 10:12 AM
**To:**     Daren Brown
**Subject:** AHF v City Amended Designation of Experts

Good morning, Daren,
The City has secured the services of successor experts for Ike Guest but we do not have reports from them yet.
While the reports are generally supposed to be provided with the designation, because of time constraints, with your agreement that we can provide the reports later, I can go ahead and provide you with an Amended Designation of Expert Witnesses identifying those experts which would allow you to at least set some times for depositions of those experts. (I am in the process now of getting estimates from the experts regarding when their reports will be ready and can also let you know that as soon as I find out.)

If, because of prior scheduling conflicts of counsel or the experts, it is not possible for you to conduct the depositions of these experts before the discovery deadline, we would, of course, agree to your taking of those depositions beyond that date with one caveat, particularly since your email to me earlier today indicated that we will have to conduct the continuation of Dr. Lacefield's deposition beyond the discovery deadline to accommodate his schedule.  The caveat is this -- conducting any depositions beyond the discovery deadline necessitates a concommitant enlargement of the time for filing motions.   If you are agreeable, perhaps we could identify and agree to the depositions that may need to be conducted beyond the discovery deadline and agree to a limited extension – that is, an extension of discovery just for the taking of those depositions – and an extension of similar length of the motion deadline.  I do not believe there would be any need to affect the trial date.

As for the September 8 date that Dr. Lacefield is available, I have a scheduling conflict but I may be able to work it out so I will let you know on that as soon as I determine if it can be worked out.

Thank you.
Victoria

Victoria W. Thomas
Assistant City Attorney
Dallas City Attorney's Office
1500 Marilla Street, Room 7CN
Dallas, Texas 75201
214.670.4308
214.670.0622 (Fax)

9/29/2008



PRIVILEGED AND CONFIDENTIAL LEGAL COMMUNICATION

This communication, including any attachments, is intended solely for the addressee(s) named above and may contain confidential and legally privileged information. Unauthorized use, disclosure, or copying is prohibited. If you have received this communication in error, please notify the sender immediately by replying to this communication and then delete it from your system. This communication contains the thoughts of the sender and does not represent official policy of the City of Dallas unless the communication specifically so states.

# EXHIBIT "H"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| AHF COMMUNITY<br>DEVELOPMENT, L.L.C., | §<br>§<br>§ | |
| Plaintiff, | §<br>§ | |
| v. | §<br>§ | CAUSE NO. 3-06 CV 1035D<br>ECF |
| CITY OF DALLAS, et al., | §<br>§ | |
| Defendants. | § | |

## PLAINTIFF'S RULE 26(a)(2) DISCLOSURE

In accordance with FED. R. CIV. P. Rule 26(a)(2), Plaintiff discloses the following as persons who may be used at trial to present evidence under FED. R. EVID. 702, 703 or 705:

**Retained Experts**

Dr. Gary Lacefield
Risk Mitigation Group
1807 Mid Pines Court
Arlington, Texas 76012
Telephone: 806/783-7788

Dr. Lacefield is a consultant for Risk Mitigation Group, a real estate related financial consulting company specializing in fair lending and fair housing issues. Dr. Lacefield will offer expert opinions as to the liability of the City of Dallas and the named individual Defendants with respect to the Fair Housing implications regarding properties owned, controlled or managed by AHF Community Development, L.L.C. Dr. Lacefield will also offer expert opinions as to the damages incurred by the Plaintiff and the disparate impact of the Defendants' actions upon minorities and families with minor children.

Dr. Lacefield is a retained expert whose written report is attached to this disclosure as Exhibit "A".

Brad Weinberg, MAI, CCIM
Novogradac and Company LLP
4520 East-West Highway
Suite 615
Bethesda, MD 20815

Mr. Weinberg is a partner in Novogradac & Company LLP and heads the valuation consulting and appraisal division nationally.  Mr. Weingberg will offer expert opinions as to the Plaintiff's damages, including the Plaintiff's loss in value and revenue as a result of the Defendants' actions.

Mr. Weinberg is a retained expert whose written report is attached to this disclosure as Exhibit "B".

Steve Coma
Business Bankers & Trust
Charlotte, North Carolina
Telephone: (704)954-1095

Mr. Coma is a director of BB&T Capital Markets.  Mr. Coma will offer expert opinions as to the Plaintiff's damages, including the damages the Plaintiff has incurred on its cross-collateralized and cross-defaulted bond at issue in this matter.

Mr. Coma is a retained expert whose written report is attached to this disclosure as Exhibit "C".

John Ben Blanchard
Shawn D. Twing
SPROUSE SHRADER SMITH P.C.
701 S. Taylor, Suite 500
Amarillo, Texas 79101
(806) 468-3300

Messrs. Blanchard and Twing are Shareholders at the Sprouse Shrader Smith P.C. law firm in Amarillo, Texas.  Messrs. Blanchard and Twing will offer expert testimony regarding the reasonableness and necessity of the attorneys' fees charged through the trial of this case.  The hourly billing rates of the attorneys assigned to this case range from $135.00 to $275.00.  Legal assistants assigned to this case billed $100.00 per hour. The basis for these impressions and opinions will be a review of the pleadings, the nature of the claims, the products of discovery and the factors enumerated by the Texas Rules of Professional conduct to be considered in determining whether attorneys' fees are reasonable and necessary.

Information about Messrs. Blanchard and Twing is attached to this disclosure as Exhibit "D".

Daniel F. Perez
AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
1700 Pacific Avenue
Suite 4100
Dallas, Texas 75201
(214) 289-6659

        Mr. Perez is a Partner at the Akin, Gump, Strauss, Hauer & Feld, L.L.P. law firm in Dallas, Texas.  Mr. Perez will offer expert testimony regarding the reasonableness and necessity of the attorneys' fees charged through the trial of this case.  The basis for these impressions and opinions will be a review of the pleadings, the nature of the claims, the products of discovery and the factors enumerated by the Texas Rules of Professional conduct to be considered in determining whether attorneys' fees are reasonable and necessary.

        Information about Mr. Perez is attached to this disclosure as Exhibit "E".

## Non-Retained Experts

        Plaintiff may call any experts designated by Defendants.

        Plaintiff reserves the right to designate additional experts as the need arises and also reserves the right to designate additional experts should Defendants be allowed to designate experts past the scheduling order deadline.

        Dated: January 29, 2007.

                                Respectfully submitted,

                                John Ben Blanchard, Texas SBN: 02446200
                                Shawn D. Twing, Texas SBN: 00798008
                                J. Daren Brown, Texas SBN: 24036271
                                Melinda F. Rahlfs, Texas SBN: 24040893
                                SPROUSE SHRADER SMITH  P.C.
                                701 S. Taylor, Suite 500 (79101)
                                Post Office Box 15008
                                Amarillo, Texas  79105-5008
                                Telephone: 806/468-3300
                                Facsimile:  806/373-3454


                                John Ben Blanchard
                                ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of January, 2007, a true and correct copy of the above and foregoing was sent as shown:

| Amy Messer | Certified Mail, Return Receipt Requested | ☒ |
|---|---|---|
| City Attorney's Office | United States Regular Mail | ☐ |
| 7BN Dallas City Hall | Overnight Mail | ☐ |
| 1500 Marilla Street | Via Facsimile Transmission | ☐ |
| Dallas, Texas 75201 | Via Hand Delivery | ☐ |
| *Attorney for Defendants* | | |

John Ben Blanchard

412850_1.DOC
0567.450

January 29, 2007


To:     John Ben Blanchard, Esq.
        Sprouse Shrader Smith P.C.
        701 S. Taylor, Suite 500
        Amarillo, Texas 79101


From:  Stephen R. Coma

Re:     Impact of Bent Creek Apartment Financial Underperformance on Texas State Housing
        Authority Tax Exempt Bonds, American Housing Foundation as Borrower

**Overview:**

American Housing Foundation ("AHF") entered into a Loan Agreement with Texas State
Affordable Housing Corporation in 2002 ("TSAHC") where TSAHC agreed to issue bonds in
return for certain inducements.  The Loan Agreement between TSAHC and AHF provided
AHF with funds to purchase 11 existing multi-family housing properties, located principally in
the Dallas and Houston markets.  The transaction has the following features:

- The properties, while separate and discreet properties, are cross collateralized (meaning
  all cash flows from all properties have been combined and pledged to bondholders).
  The rationale for cross collateralization is to provide a smoothing effect on total cash
  flows pledged to bondholders.

  Cross collateralization structures work very well if the majority of the properties
  perform at or near expectations regarding operating income. Excess revenues from these
  properties may be used to support a property or properties that are performing less well.

- Bonds were issued in two tranches (levels of credit support).  The senior tranche debt
  service payments were insured by MBIA.  The second, or junior tranche, was not credit
  enhanced and purchased by selected institutional investors.

To determine the impact of certain actions by the City of Dallas in regard to the properties and
associated debt, I have reviewed the specific bond documents and the associated financial
statements for the projects, including preliminary, unaudited numbers from 2006.  I have not
reviewed any other documentation with regard to these properties.

**Performance of the Properties Since 2001:**

A number of events affecting the properties have occurred since the Bonds were issued in 2002
against 2001 audits.  They include:

- A general decline in the real estate markets where the projects are based
- Hurricane Katrina and related issues at selected properties
- The detailed actions of the City of Dallas in regard to the Bent Creek property.

EXHIBIT "C"



The chart below illustrates performance of the properties at time of issuance of the Bonds (2001 Audits) and the intermediate and current performance of the properties.

| | 2004 | | 2005 | | 2004-2005 Change | |
|---|---|---|---|---|---|---|
| | Revenue | Net Revenue | Revenue | Net Revenue | Revenue | Net Revenue |
| Woodedge | 973,274 | 137,125 | 1,000,957 | (96,117) | 2.84% | -170% |
| Aston Brook | 1,082,638 | 61,675 | 1,088,496 | (131,713) | 0.54% | -314% |
| Bent Creek | 1,875,765 | (823,344) | 1,727,534 | (1,148,649) | -7.90% | -40% |
| Cimarron | 1,249,548 | (31,178) | 1,246,723 | (34,000) | -0.23% | -9% |
| Creekwood | 2,054,061 | (1,022,539) | 2,119,213 | (970,651) | 3.17% | 5% |
| Fountaingate | 1,779,283 | (76,647) | 1,839,318 | (301,344) | 3.37% | -293% |
| Northwoods | 1,910,017 | (671,507) | 1,833,932 | (185,973) | -3.98% | 72% |
| One Willow | 2,265,038 | (180,577) | 2,184,114 | (221,744) | -3.57% | -23% |
| Pine Creek & Stony Creek | 3,004,342 | 247,860 | 2,734,213 | (850,061) | -8.99% | -443% |
| Settler's Cove | 1,248,579 | (38,034) | 1,271,448 | (30,483) | 1.83% | 20% |
| Shadowridge | 1,166,547 | (141,930) | 1,186,490 | (82,168) | 1.71% | 42% |

| | 2005 | | 2006* | | 2005-2006 Change | |
|---|---|---|---|---|---|---|
| | Revenue | Net Revenue | Revenue | Net Revenue | Revenue | Net Revenue |
| Woodedge | 1,000,957 | (96,117) | 886,908 | 147,484 | -11.39% | 253% |
| Aston Brook | 1,088,496 | (131,713) | 940,965 | 150,259 | -13.55% | 214% |
| Bent Creek | 1,727,534 | (1,148,649) | 908,740 | (1,109,841) | -47.40% | 3% |
| Cimarron | 1,246,723 | (34,000) | 1,115,458 | 240,478 | -10.53% | 807% |
| Creekwood | 2,119,213 | (970,651) | 1,352,895 | (960,011) | -36.16% | 1% |
| Fountaingate | 1,839,318 | (301,344) | 1,487,359 | 103,672 | -19.14% | 134% |
| Northwoods | 1,833,932 | (185,973) | 1,563,914 | 372,550 | -14.72% | 300% |
| One Willow | 2,184,114 | (221,744) | 2,005,769 | 269,486 | -8.17% | 222% |
| Pine Creek & Stony Creek | 2,734,213 | (850,061) | 2,111,330 | (153,148) | -22.78% | 82% |
| Settler's Cove | 1,271,448 | (30,483) | 1,177,970 | 292,818 | -7.35% | 1061% |
| Shadowridge | 1,186,490 | (82,168) | 979,128 | (7,948) | -17.48% | 90% |

* 2006 numbers are unaudited

| | 2001 | | 2006* | | 2001-2006 Change | |
|---|---|---|---|---|---|---|
| | Revenue | Net Revenue | Revenue | Net Revenue | Revenue | Net Revenue |
| Woodedge | 949,868 | 559,082 | 886,908 | 147,484 | -6.63% | -74% |
| Aston Brook | 1,008,148 | 564,077 | 940,965 | 150,259 | -6.66% | -73% |
| Bent Creek | 2,128,208 | 1,338,386 | 908,740 | (1,109,841) | -57.30% | -183% |
| Cimarron | 1,144,499 | 660,023 | 1,115,458 | 240,478 | -2.54% | -64% |
| Creekwood | 2,573,676 | 1,646,235 | 1,352,895 | (960,011) | -47.43% | -158% |
| Fountaingate | 1,846,906 | 1,315,240 | 1,487,359 | 103,672 | -19.47% | -92% |
| Northwoods | 1,886,499 | 1,143,421 | 1,563,914 | 372,550 | -17.10% | -67% |
| One Willow | 2,197,436 | 1,314,391 | 2,005,769 | 269,486 | -8.72% | -79% |
| Pine Creek & Stony Creek | 2,840,715 | 1,635,334 | 2,111,330 | (153,148) | -25.68% | -109% |
| Settler's Cove | 1,191,097 | 752,468 | 1,177,970 | 292,818 | -1.10% | -61% |
| Shadowridge | 1,227,044 | 815,361 | 979,128 | (7,948) | -20.20% | -101% |

## Conclusions Drawn from Property Performance

- Due to a series of adverse movements in the market where the properties are located, the entire portfolio performed at levels below those anticipated from the period soon after the transaction up to and including the 2005 fiscal year.

- The 2006 fiscal year showed marked improvement in certain of the properties, reflecting increased management oversight and generally improved market conditions for multi-family housing.

- The Bent Creek property continues to underperform versus the portfolio. Revenues for 2006 continued to decline, in marked contrast to performance of other properties. Only Creekwood showed similar, although not as severe, performance.



**The Bonds:**

- The Bonds depend upon Project Revenues from all projects (because of cross collateralization) to pay debt service.

- The portfolio performance has been suboptimal and that has decreased the ability of the projects to pay debt service.

- The Bonds have not met debt service requirements (and other requirements for cash reserves) as contained in the Loan Documents.

- American Housing Foundation, TSAHC and MBIA entered into an arrangement with Goldman Sachs and BB&T Capital Markets to convert the senior tranche to a floating rate, in an effort to provide more cash flow to the projects. While this has been helpful, it did not solve all cash flow issues.

- Complete transaction documentation is included in the transcripts and the offering statement for the bond issue.

**Conclusions Regarding Bent Creek and its Effect on the Bond Issue:**

- Due to the underperformance of the portfolio, the collapse or sale of a property would put additional stress on the remaining properties.

- The appraisal for the Bent Creek property was $15,000,000. Debt was issued based upon this appraisal. If a current appraisal or market value did not equal or exceed $15,000,000, and the property were to be sold at any price less than $15,000,000, the remaining properties would bear an increased load of debt service.

- Bent Creek continues to underperform. Valuation of underperformance, relative to the remaining properties indicates that Bent Creek performed 43% worse than the portfolio average (excluding Creekwood). Net Revenues were 100% worse than the average portfolio, excluding Creekwood (see chart above).

- The present value of the differential in Net Revenue performance is as follows:

  o Annual differential in revenue: $900,000 (approximate)
  o Average life of revenue differential: 18 years
  o Present value (using current tax-exempt discount rate of 4.07%) $11,328,000.

The present value of $11,328,000 is an estimate of total present value impact of the underperformance of the Bent Creek property over the remaining term of the bond issue, relative to the portfolio as a whole.



The conclusions reached in this report are based solely upon the information reviewed and are subject to the following conditions:

- Any change in the information provided may cause a revision of conclusions reached.
- Any additional information reviewed may cause a revision of conclusions reached.
- While the calculations provided are believed to be accurate, the conclusions reached are based solely upon those calculations.  Any error in calculations may affect the conclusions reached.

The opinions expressed herein are solely my own as an individual and not those of BB&T Corporation or its executives.

**Stephen Coma CV and statement regarding testimony**

Steve is Managing Director of the Derivatives Banking Group for BB&T Capital Markets, a division of Scott & Stringfellow, Inc., a registered broker dealer subsidiary of BB&T Corporation, member NYSE/SIPC.  Prior to joining BB&T Capital Markets he worked with Banc of America Securities and Merrill Lynch & Company, where he spent 19 years in Derivative/Capital Markets and Public Finance.  He graduated with an A.B. from Princeton University and received his M.B.A., with a specialty in Finance, from the University of Chicago.  He and his wife, Karen, have two children – Nick and Stephanie.

Mr. Coma has not previously served as an expert witness.

Compensation, per the engagement letter, will be limited to expenses incurred, including travel, and an hourly rate of $200 (two hundred dollars).

Sincerely,

Stephen R. Coma

4



January 29, 2007


John Ben Blanchard, Esq.
Sprouse Shrader Smith P.C.
701 S. Taylor, Suite 500
Amarillo, Texas 79101

Re:     Analysis and Expert Witness Testimony as to the value of potential damages associated with
        the complaint of Civil Action No. 3:06-CV-1035-D.

Dear Mr. Blanchard:

I appreciate the opportunity to provide my consulting services for the above-referenced engagement.
It is my policy to confirm and define in writing the objectives and scope of each engagement and the
related timing and professional fees.

**Reference**
This engagement is in reference to Civil Action No. 3:06-CV-1035-D; AHF Community
Development, L.L.C. ("AHF") v. City of Dallas, et al; In the United States District Court for the
Northern District of Texas, Dallas Division; and the United States Department of Housing and Urban
Development Fair Housing Discrimination Complaint No. 06-06-0665-8, American Housing
Foundation, Inc. v. City of Dallas, Texas (Collectively called the "Complaint").

**Objective and Purpose**
I understand that you require the analysis and expert witness testimony as to the bond issue
associated with certain properties caused by the alleged actions taken by the City of Dallas, as
detailed in the Complaint.

**Scope**
My scope of work will include:
  a.  Review pertinent legal documents associated with the filed Complaint, i.e. the original
      complaint, responses, etc.
  b.  Review of documents related to the historic operations at Bent Creek Apartments, a 326 unit
      affordable housing development in the City of Dallas, Texas.  This may include regulatory
      agreements, condition assessment reports, correspondence, operating statements, etc.

  c.  Evaluate the revenue profile in relation to market conditions during the applicable time
      frame to determine the potential loss in value created by non market factors.
  d.  Consult with the client regarding findings and conclusions and provide written
      documentation of my findings.
  e.  Prepare and participate in hearings, depositions, trials, or other formal settings requiring
      expert witness testimony.



John Ben Blanchard
January 29, 2007
Page 2

**Timing**
It is my understanding that there is a January 29, 2007 deadline for designating expert witnesses. I will work with the client to develop an appropriate timeline and preliminary scope of work necessary to meet the required deadline.   Work can begin immediately upon receipt of the retainer and signed engagement letter.

**Invoicing and Payments**
My invoices are due on receipt.  After 90 days, unpaid fees bear interest at a rate of 12% per annum. At my option, I may formalize unpaid balances after 90 days by executing a promissory note.  Also, at my option, services may be terminated prior to the completion of the engagement if bills remain unpaid.  If I elect to terminate my services for nonpayment, you will be obligated to compensate us for all time expended and to reimburse us for all out-of-pocket expenses incurred through the date of termination.

Any unresolved claims or disputes arising out of this engagement shall be decided by arbitration in San Francisco in accordance with commercial arbitration rules of the American Arbitration Association. The award by the arbitrator shall be final and any judgment may be entered upon it in accordance with applicable rules in any court having jurisdiction. This agreement to arbitrate shall be specifically enforceable in any court having jurisdiction. Each party in any such arbitration shall pay for its own costs and attorney's fees.

Any Internet or other e-mail communication is tentative and preliminary and not final until received in signed, physical documentation form.  As such, you agree not to act upon any information received in an Internet or other e-mail communication until, and unless, you receive such information in signed, written documentation form.


RFD00262

John Ben Blanchard
January 29, 2007
Page 3

**Moving Forward**
Please confirm your wish to engage me for the above referenced assignment by signing below and faxing a copy to me.  An original copy of the engagement letter will be mailed to your corporate address to retain in your file.

Sincerely,

Stephen R. Coma

John Ben Blanchard, Esq.
Sprouse Shrader Smith P.C.

0567.450
415364_1



# EXHIBIT "I"

**IN THE UNITED STATE DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **AHF COMMUNITY** | § | |
| **DEVELOPMENT, L.L.C.,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3-06-CV-1035-D** |
| | § | **ECF** |
| **CITY OF DALLAS, et al.,** | § | |
| **Defendants.** | § | |

**CITY OF DALLAS' NOTICE OF DEPOSITION**
**WITH SUBPOENA DUCES TECUM OF STEVE COMA**

TO:    Plaintiff, by and through their attorney of record, John Ben Blanchard, Sprouse, Shrader, Smith, P.C., 701 South Taylor, Suite 500, Amarillo, Texas 79101.

Defendant, City of Dallas, pursuant to Rule 30 of the Federal Rules of Civil Procedure, hereby gives notice that it intends to take the deposition of **Steve Coma** in this action on Friday, July 18, 2008 at 10:00 a.m. (CST), 701 South Taylor, Suite 500, Amarillo, Texas 79101, then and there to give testimony before a person authorized by law to administer oaths to continue from day-to-day until completed.  The deposition will be videotaped.  In addition to the defendants and their attorneys, also present may be William D. Brown, Wanda Lorenz, or an associate CPA.

Pursuant to FED. R. CIV. P. 30(b)(1) and 34, the Deponent will produce at the time and place of the deposition the designated documents set forth in the attached Subpoena Duces Tecum, which is incorporated by reference for all purposes.

Respectfully submitted,

OFFICE OF THE CITY ATTORNEY
CITY OF DALLAS, TEXAS


VICTORIA W. THOMAS
Assistant City Attorney
Texas Bar No. 24059913
DANIEL MARTIN WEIR
Assistant City Attorney
Texas Bar No. 24054310
PETER B. HASKEL
Assistant City Attorney
Texas Bar No. 09198900

7CN Dallas City Hall
1500 Marilla Street
Dallas, Texas 75201
214-670-3519 telephone
214-670-0622 facsimile
victoria.thomas@dallascityhall.com
dan.weir@dallascityhall.com
peter.haskel@dallascityhall.com

**Attorneys for Defendant City of Dallas**


## CERTIFICATE OF SERVICE

I certify that on the ___ day of _____, 2008, a true and correct copy of the foregoing was served by first class mail, U.S. postage prepaid, upon all counsel of record as follows:

John Ben Blanchard
J. Daren Brown
Sprouse Shrader Smith, P.C.
701 S. Taylor, Suite 500
P.O. Box 15008
Amarillo, Texas 79105-5008


PETER B. HASKEL

**CITY OF DALLAS' NOTICE OF DEPOSITION
WITH SUBPOENA DUCES TECUM OF STEVE COMA – Page 2**

## SUBPOENA DUCES TECUM

1.     "Document" and "documents" mean all electronic data, as that term is defined below, and all written, reported, recorded, printed or typed or graphic matter, however produced or reproduced, now or at any time in Defendant's possession, custody or control, including but not limited to, all letters, correspondence, telegrams, telexes, cables, telephone records, logs and notations, intra and interoffice communications, microfilm, diaries, calendar entries, summaries, messages, audio tapes, videotapes, digital recordings, computer disks (discs) or tapes, computer programs and software, photographs, film, invoices, files, ledgers, journals and other formal and informal books of record and account, minutes, bulletins, instructions, work assignments, reports, memoranda, notes, notebooks, speeches, drafts, data sheets, data compilations, press releases, public statements and/or announcements, public and governmental filings, opinions, worksheets, statistics, contracts, agreements, intra-corporate drafts of the foregoing items and copies or reproductions of the foregoing upon which notations in writing have been made which do not appear on the original.

2.     "Electronic Data" means all data or information that exists in an electronic or magnetic form, including, but not limited to e-mails, software, calendars, task lists, spreadsheets, databases, metadata, codes, programs, formulas and any other computer data, however produced or reproduced, now or at any time in Plaintiffs possession, custody or control.

<u>Documents and Things Requested</u>

1.    Any documents reviewed or consulted to assist with the preparation of your report or formulation of your opinion regarding Bent Creek Apartments, American Housing Foundation, or AHF Community Development, LLC.

# EXHIBIT "J"

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **AHF COMMUNITY** | § | |
| **DEVELOPMENT, L.L.C.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CAUSE NO. 3-06 CV 1035D** |
| | § | **ECF** |
| **CITY OF DALLAS, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF'S FIRST SUPPLEMENTAL RULE 26(a)(2) DISCLOSURE**

In accordance with FED. R. CIV. P. Rule 26(e)(1), Plaintiff supplements its prior FED. R. CIV. P. Rule 26(a)(2) disclosures as follows:

**Retained Experts**

Steve Coma
BB & T Capital Markets
200 S. College, 7th Floor
Charlotte, North Carolina 28202
Telephone: (704)954-1095

Mr. Coma is the managing director of BB&T Capital Markets. Mr. Coma will offer expert opinions as to the Plaintiff's damages, including the damages the Plaintiff has incurred on its cross-collateralized and cross-defaulted bond at issue in this matter.

Mr. Coma is a retained expert whose written report has been previously provided to Defendants. The data and information relied upon by Mr. Coma is referenced in his report but also includes the Second Amended Complaint and Jury Demand and documents Bates labeled TSAHC 0001 – 8363 previously produced to the Defendants. Plaintiff also attaches Mr. Coma's amended report dated July 11, 2008.

Dated: July 11, 2008.

Respectfully submitted,

John Ben Blanchard, Texas SBN: 02446200
Shawn D. Twing, Texas SBN: 00798008
J. Daren Brown, Texas SBN: 24036271
SPROUSE SHRADER SMITH P.C.
701 S. Taylor, Suite 500 (79101)
P. O. Box 15008
Amarillo, Texas 79105-5008
Telephone: 806/468-3300
Facsimile: 806/373-3454

J. Daren Brown
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of July, 2008, a true and correct copy of the above and foregoing was sent as shown:

| | | |
|---|---|---|
| Victoria Thomas | Certified Mail, Return Receipt Requested | X |
| Chris Caso | United States Regular Mail | ☐ |
| City Attorney's Office | | |
| 7BN Dallas City Hall | Overnight Mail | ☐ |
| 1500 Marilla Street | Via Facsimile Transmission | X |
| Dallas, Texas 75201 | Via Hand Delivery | ☐ |
| *Attorney for Defendants* | | |

_____

J. Daren Brown

487286_1.DOC
0567.450

# BB&T Capital Markets
### a division of Scott & Stringfellow, Inc.

**Stephen R. Coma**
Managing Director
200 South College Street
7th Floor; Mail code: 500.01.07.00
Charlotte, North Carolina 28202

(704) 954.1095 Tel
(704) 954.1084 Fax

July 11, 2008

John Ben Blanchard, Esq.
Sprouse Shrader Smith P.C.
701 S. Taylor, Suite 500
Amarillo, Texas 79101

Re:     Impact of Bent Creek Apartment Financial Underperformance on Texas State Housing
        Authority Tax Exempt Bonds, American Housing Foundation as Borrower

**Overview:**

American Housing Foundation ("AHF") entered into a Loan Agreement with Texas State
Affordable Housing Corporation in 2002 ("TSAHC") where TSAHC agreed to issue bonds in
return for certain inducements. The Loan Agreement between TSAHC and AHF provided AHF
with funds to purchase 11 existing multi-family housing properties, located principally in the
Dallas and Houston markets. The transaction has the following features:

- The properties, while separate and discreet properties, are cross collateralized (meaning all
  cash flows from all properties have been combined and pledged to bondholders). The
  rationale for cross collateralization is to provide a smoothing effect on total cash flows
  pledged to bondholders.

  Cross collateralization structures work very well if the majority of the properties perform at
  or near expectations regarding operating income. Excess revenues from these properties
  may be used to support a property or properties that are performing less well.

- Bonds were issued in two tranches (levels of credit support). The senior tranche debt
  service payments were insured by MBIA. The second, or junior tranche, was not credit
  enhanced and purchased by selected institutional investors.

BB&T Capital Markets is a division of Scott & Stringfellow, Inc., a registered broker/dealer subsidiary of BB&T Corporation • Member NYSE/SIPC



Page 2 of 5
Stephen R. Coma

I have reviewed the specific bond documents and the associated financial statements for the projects, including preliminary, unaudited numbers from 2006. I have not reviewed any other documentation with regard to these properties.

**Performance of the Properties Since 2001:**

The chart below illustrates performance of the properties at time of issuance of the Bonds (2001 Audits) and the intermediate and current performance of the properties.

| | 2004 | | 2005 | | 2004-2005 Change | |
|---|---|---|---|---|---|---|
| | Revenue | Net Revenue | Revenue | Net Revenue | Revenue | Net Revenue |
| Woodedge | 973,274 | 137,125 | 1,000,957 | (98,117) | 2.84% | -170% |
| Aston Brook | 1,082,638 | 61,675 | 1,088,496 | (131,713) | 0.54% | -314% |
| Bent Creek | 1,875,765 | (823,344) | 1,727,534 | (1,148,649) | -7.90% | -40% |
| Cimarron | 1,249,548 | (31,178) | 1,246,723 | (34,000) | -0.23% | -9% |
| Creekwood | 2,054,061 | (1,022,539) | 2,119,213 | (970,651) | 3.17% | 5% |
| Fountaingate | 1,778,283 | (76,547) | 1,838,318 | (301,344) | 3.37% | -293% |
| Northwoods | 1,910,017 | (871,507) | 1,833,932 | (185,973) | -3.98% | 72% |
| One Willow | 2,265,038 | (180,577) | 2,184,114 | (221,744) | -3.57% | -23% |
| Pine Creek & Stony Creek | 3,004,342 | 247,860 | 2,734,213 | (850,061) | -8.99% | -443% |
| Settler's Cove | 1,248,579 | (38,034) | 1,271,448 | (30,463) | 1.85% | 20% |
| Shadowridge | 1,156,547 | (141,930) | 1,186,490 | (82,168) | 1.71% | 42% |

| | 2005 | | 2006* | | 2005-2006 Change | |
|---|---|---|---|---|---|---|
| | Revenue | Net Revenue | Revenue | Net Revenue | Revenue | Net Revenue |
| Woodedge | 1,000,957 | (98,117) | 886,905 | 147,484 | -11.39% | 253% |
| Aston Brook | 1,088,496 | (131,713) | 940,965 | 150,259 | -13.55% | 214% |
| Bent Creek | 1,727,534 | (1,148,649) | 908,740 | (1,109,841) | -47.40% | 3% |
| Cimarron | 1,246,723 | (34,000) | 1,115,458 | 240,478 | -10.53% | 807% |
| Creekwood | 2,119,213 | (970,651) | 1,362,895 | (960,011) | -36.16% | 1% |
| Fountaingate | 1,838,318 | (301,344) | 1,487,359 | 103,672 | -19.14% | 134% |
| Northwoods | 1,833,932 | (185,973) | 1,563,914 | 372,550 | -14.72% | 300% |
| One Willow | 2,184,114 | (221,744) | 2,005,789 | 269,496 | -8.17% | 222% |
| Pine Creek & Stony Creek | 2,734,213 | (850,061) | 2,111,330 | (153,148) | -22.78% | 82% |
| Settler's Cove | 1,271,448 | (30,463) | 1,177,970 | 292,818 | -7.35% | 1081% |
| Shadowridge | 1,186,490 | (82,168) | 979,128 | (7,946) | -17.48% | 90% |

* 2006 numbers are unaudited

| | 2001 | | 2006* | | 2001-2006 Change | |
|---|---|---|---|---|---|---|
| | Revenue | Net Revenue | Revenue | Net Revenue | Revenue | Net Revenue |
| Woodedge | 949,866 | 569,082 | 886,905 | 147,484 | -6.63% | -74% |
| Aston Brook | 1,008,146 | 584,077 | 940,965 | 150,259 | -6.66% | -73% |
| Bent Creek | 2,128,208 | 1,338,389 | 908,740 | (1,109,841) | -57.30% | -183% |
| Cimarron | 1,144,498 | 660,023 | 1,115,458 | 240,478 | -2.54% | -64% |
| Creekwood | 2,573,876 | 1,646,235 | 1,362,895 | (960,011) | -47.43% | -158% |
| Fountaingate | 1,846,936 | 1,316,240 | 1,487,359 | 103,672 | -19.47% | -92% |
| Northwoods | 1,886,499 | 1,143,421 | 1,563,914 | 372,550 | -17.10% | -67% |
| One Willow | 2,187,438 | 1,314,391 | 2,005,789 | 269,496 | -8.72% | -76% |
| Pine Creek & Stony Creek | 2,840,715 | 1,635,334 | 2,111,330 | (153,148) | -25.88% | -109% |
| Settler's Cove | 1,181,097 | 752,486 | 1,177,970 | 292,818 | -1.10% | -61% |
| Shadowridge | 1,227,044 | 815,361 | 979,128 | (7,946) | -20.20% | -101% |



*COM00021*

Page 3 of 5
Stephen R. Coma

### Conclusions Drawn from Property Performance

- The entire portfolio performed at levels below those anticipated from the period soon after the transaction up to and including the 2005 fiscal year.

- The 2006 fiscal year showed marked improvement in certain of the properties, reflecting increased management oversight and generally improved market conditions for multi-family housing.

- The Bent Creek property continues to underperform versus the portfolio. Revenues for 2006 continued to decline, in marked contrast to performance of other properties. Only Creekwood showed similar, although not as severe, performance.

### The Bonds:

- The Bonds depend upon Project Revenues from all projects (because of cross collateralization) to pay debt service.

- The portfolio performance has been suboptimal and that has decreased the ability of the projects to pay debt service.

- The Bonds have not met debt service requirements (and other requirements for cash reserves) as contained in the Loan Documents.

- American Housing Foundation, TSAHC and MBIA entered into an arrangement with Goldman Sachs and BB&T Capital Markets to convert the senior tranche to a floating rate, in an effort to provide more cash flow to the projects. While this has been helpful, it did not solve all cash flow issues.

- Complete transaction documentation is included in the transcripts and the offering statement for the bond issue.

### Conclusions Regarding Bent Creek and its Effect on the Bond Issue:

- Due to the underperformance of the portfolio, the collapse or sale of a property would put additional stress on the remaining properties.

- The appraisal for the Bent Creek property was $15,000,000. Debt was issued based upon this appraisal. If a current appraisal or market value did not equal or exceed $15,000,000, and the property were to be sold at any price less than $15,000,000, the remaining properties would bear an increased load of debt service.



- Bent Creek continues to underperform.  Valuation of underperformance, relative to the remaining properties indicates that Bent Creek performed 43% worse than the portfolio average (excluding Creekwood).  Net Revenues were 100% worse than the average portfolio, excluding Creekwood (see chart above).

- The present value of the differential in Net Revenue performance is as follows:

  o  Annual differential in revenue:  $900,000 (approximate)
  o  Average life of revenue differential: 18 years
  o  Present value (using current tax-exempt discount rate of 4.07%) $11,328,000.

The present value of $11,328,000 is an estimate of total present value impact of the underperformance of the Bent Creek property over the remaining term of the bond issue, relative to the portfolio as a whole.

The conclusions reached in this report are based solely upon the information reviewed and are subject to the following conditions:

- Any change in the information provided may cause a revision of conclusions reached.
- Any additional information reviewed may cause a revision of conclusions reached.
- While the calculations provided are believed to be accurate, the conclusions reached are based solely upon those calculations.  Any error in calculations may affect the conclusions reached.

The opinions expressed herein are solely my own as an individual and not those of BB&T Corporation or its executives.


* C O M 0 0 0 2 3 *

**Stephen Coma CV and statement regarding testimony**

Steve is Managing Director of the Derivatives Banking Group for BB&T Capital Markets, a division of Scott & Stringfellow, Inc., a registered broker dealer subsidiary of BB&T Corporation, member NYSE/SIPC. Prior to joining BB&T Capital Markets he worked with Banc of America Securities and Merrill Lynch & Company, where he spent 19 years in Derivative/Capital Markets and Public Finance. He graduated with an A.B. from Princeton University and received his M.B.A., with a specialty in Finance, from the University of Chicago. He and his wife, Karen, have two children – Nick and Stephanie.

Mr. Coma has not previously served as an expert witness.

Compensation, per the engagement letter, will be limited to expenses incurred, including travel, and an hourly rate of $200 (two hundred dollars).

Sincerely,



Stephen R. Coma
Managing Director

* C O M 0 0 0 2 4 *

# EXHIBIT "K"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| AHF COMMUNITY DEVELOPMENT, L.L.C., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CAUSE NO. 3-06 CV 1035D ECF |
| CITY OF DALLAS, et al., | § § | |
| Defendants. | § § | |

## PLAINTIFF'S THIRD SUPPLEMENTAL RULE 26(a)(2) DISCLOSURE

In accordance with FED. R. CIV. P. Rule 26(e)(1), Plaintiff supplements its prior FED. R.

CIV. P. Rule 26(a)(2) disclosures as follows:

### Retained Experts

Steve Coma
BB & T Capital Markets
200 S. College, 7th Floor
Charlotte, North Carolina 28202
Telephone: (704)954-1095

Mr. Coma is the managing director of BB&T Capital Markets. Mr. Coma will offer expert opinions as to the Plaintiff's damages, including the damages the Plaintiff has incurred on its cross-collateralized and cross-defaulted bond at issue in this matter.

Mr. Coma is a retained expert whose written report has been previously provided to Defendants. The data and information relied upon by Mr. Coma is referenced in his report but also includes the Second Amended Complaint and Jury Demand, the 2002 through 2007 audited financial statements for the projects, and documents Bates labeled AHF 8765 – AHF 16119, and COM00025 - COM00230. Also attached is Mr. Coma's amended report dated August 12, 2008.

Dated: August 18, 2008.

Respectfully submitted,

John Ben Blanchard, Texas SBN: 02446200
Shawn D. Twing, Texas SBN: 00798008
J. Daren Brown, Texas SBN: 24036271
SPROUSE SHRADER SMITH  P.C.
701 S. Taylor, Suite 500 (79101)
P. O. Box 15008
Amarillo, Texas  79105-5008
Telephone: 806/468-3300
Facsimile:  806/373-3454

_____
J. Daren Brown
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of August, 2008, a true and correct copy of the above and foregoing was sent as shown:

| | | |
|---|---|---|
| Victoria Thomas | Certified Mail, Return Receipt Requested | **X** |
| CITY ATTORNEY'S OFFICE | United States Regular Mail | ☐ |
| 7BN Dallas City Hall | Overnight Mail | ☐ |
| 1500 Marilla Street | Via Facsimile Transmission | **X** |
| Dallas, Texas  75201 | Via Hand Delivery | ☐ |
| *Attorney for Defendants* | | |

J. Daren Brown

491793_1.DOC
\0567.450

# BB&T Capital Markets

a division of Scott & Stringfellow, Inc.

**Stephen R. Coma**
Managing Director
200 South College Street
7th Floor; Mail code: 500.01.07.00
Charlotte, North Carolina 28202

(704) 954.1095 Tel
(704) 954.1084 Fax

August 12, 2008

John Ben Blanchard, Esq.
Sprouse Shrader Smith P.C.
701 S. Taylor, Suite 500
Amarillo, Texas 79101

Re:   Impact of Bent Creek Apartment Financial Underperformance on Texas State Housing
      Authority Tax Exempt Bonds, American Housing Foundation as Borrower, Amended Report

**Overview:**

American Housing Foundation ("AHF") entered into a Loan Agreement with Texas State
Affordable Housing Corporation in 2002 ("TSAHC") where TSAHC agreed to issue bonds in
return for certain inducements.  The Loan Agreement between TSAHC and AHF provided AHF
with funds to purchase 11 existing multi-family housing properties, located principally in the
Dallas and Houston markets.  The transaction has the following features:

- The properties, while separate and discreet properties, are cross collateralized (meaning all
  cash flows from all properties have been combined and pledged to bondholders).  The
  rationale for cross collateralization is to provide a smoothing effect on total cash flows
  pledged to bondholders.

  Cross collateralization structures work very well if the majority of the properties perform at
  or near expectations regarding operating income.  Excess revenues from these properties
  may be used to support a property or properties that are performing less well.

- Bonds were issued in two tranches (levels of credit support).  The senior tranche debt
  service payments were insured by MBIA.  The second, or junior tranche, was not credit
  enhanced and purchased by selected institutional investors.

I have reviewed the specific bond documents and the associated financial statements for the
projects, including the audited financial statements from 2002 through 2007.  I have not reviewed
any other documentation with regard to these properties.

COM00231

Page 2 of 5
Stephen R. Coma

**Performance of the Properties Since 2002:**

The chart below illustrates performance of the properties at time of issuance of the Bonds (2002 Audits) and the intermediate and current performance of the properties. The following assumptions have been made in all subsequent analyses:

- Revenue was defined per the Audited Financial statements from each year and is taken from the Total Revenue line, generally incorporating Net Rental Income and Other Operating Revenue. For purposes of this report, no other adjustments were made. Expenses were not considered.
- 2002 Revenue was adjusted to extrapolate an entire year of results. The audits represent only the period of AHF ownership and so are not directly comparable.

**Conclusions Drawn from Property Performance**

- The entire portfolio performed at levels below those anticipated from the period soon after the transaction up to and including the 2007 fiscal year.

- The 2007 fiscal year showed marked improvement in certain of the properties, reflecting increased management oversight and generally improved market conditions for multi-family housing.

- The Bent Creek property continues to underperform versus the portfolio. Revenues for 2006 continued to decline dramatically, in marked contrast to performance of other properties. Only Creekwood showed similar, although not as severe, performance.

**The Bonds:**

- The Bonds depend upon Project Revenues from all projects (because of cross collateralization) to pay debt service.

- The portfolio performance has been suboptimal and that has decreased the ability of the projects to pay debt service.

- The Bonds have not met debt service requirements (and other requirements for cash reserves) as contained in the Loan Documents.

- American Housing Foundation, TSAHC and MBIA entered into an arrangement with Goldman Sachs and BB&T Capital Markets to convert the senior tranche to a floating rate, in an effort to provide more cash flow to the projects. While this has been helpful, it did not solve all cash flow issues.

- Complete transaction documentation is included in the transcripts and the offering statement for the bond issue.


* C O M 0 0 2 3 2 *

**Conclusions Regarding Bent Creek and its Effect on the Bond Issue:**

- Due to the underperformance of the entire portfolio, the collapse or sale of a property would put additional stress on the remaining properties.

- The appraisal for the Bent Creek property was $15,000,000. Debt was issued based upon this appraisal. If a current appraisal or market value did not equal or exceed $15,000,000, and the property were to be sold at any price less than $15,000,000, the remaining properties would bear an increased load of debt service.

- Bent Creek continues to underperform. Valuation of underperformance, relative to the remaining properties indicates that Bent Creek performed 43% worse than the initial underwrite, while the portfolio average (excluding Bent Creek) was -11%.

- The present value of the differential in Revenue performance is as follows:

  - Annual differential in revenue from 2002 to 2006 (the period under review, as described to me)
  - Average life of revenue differential: 29 years (the remaining term of the Bonds)
  - Present value (using different tax-exempt discount rates)

The present value calculations are an estimate of total present value impact of the underperformance of the Bent Creek property over the remaining term of the bond issue, relative to the portfolio as a whole. The present value calculations are described in the table on page 5.

The conclusions reached in this report are based solely upon the information reviewed and are subject to the following conditions:

- Any change in the information provided may cause a revision of conclusions reached.
- Any additional information reviewed may cause a revision of conclusions reached.
- While the calculations provided are believed to be accurate, the conclusions reached are based solely upon those calculations. Any error in calculations may affect the conclusions reached.

The opinions expressed herein are solely my own as an individual and not those of BB&T Corporation or its executives.



**Stephen Coma CV and statement regarding testimony**

Steve is Managing Director of the Derivatives Banking Group for BB&T Capital Markets, a division of Scott & Stringfellow, Inc., a registered broker dealer subsidiary of BB&T Corporation, member NYSE/SIPC. Prior to joining BB&T Capital Markets he worked with Banc of America Securities and Merrill Lynch & Company, where he spent 19 years in Derivative/Capital Markets and Public Finance. He graduated with an A.B. from Princeton University and received his M.B.A., with a specialty in Finance, from the University of Chicago. He and his wife, Karen, have two children – Nick and Stephanie.

Mr. Coma has not previously served as an expert witness.

Compensation, per the engagement letter, will be limited to expenses incurred, including travel, and an hourly rate of $200 (two hundred dollars).

Sincerely,

Stephen R. Coma
Managing Director

C O M 0 0 2 3 4

Page 5 of 5
Stephen R. Coma

American Housing Foundation
Property Portfolio Performance
2002 (adjusted) through 2007

| Property | 2002 Revenue | 2002 Adjusted for Day Count | 2003 Revenue | 2004 Revenue | 2005 Revenue | 2006 Revenue | 2007 Revenue |
|---|---|---|---|---|---|---|---|
| Woodedge | 772,414 | 925,202 | 848,610 | 983,274 | 1,020,567 | 957,781 | 919,255 |
| Acton Brook | 621,352 | 1,003,341 | 1,620,560 | 1,082,638 | 1,033,493 | 1,023,832 | 1,002,570 |
| Bent Creek | 1,667,685 | 2,663,867 | 2,852,158 | 1,845,765 | 1,737,524 | 1,734,332 | 1,204,852 |
| Cimarron | 938,687 | 1,210,648 | 1,102,714 | 1,303,568 | 1,185,135 | 1,185,135 | 1,172,654 |
| Creekwood | 1,831,478 | 2,352,154 | 2,295,236 | 2,054,651 | 2,118,743 | 1,694,510 | 1,645,549 |
| Fountaingate | 1,573,340 | 1,766,722 | 1,672,597 | 1,778,783 | 1,832,338 | 1,768,845 | 1,696,120 |
| Northwoods | 1,526,382 | 1,561,497 | 1,688,109 | 1,910,047 | 1,533,562 | 1,780,250 | 1,852,717 |
| Oso Vista | 1,894,462 | 2,454,349 | 2,705,686 | 2,305,688 | 2,184,114 | 2,524,428 | 2,066,688 |
| Pine Creek & Stony Creek | 3,346,442 | 3,628,909 | 3,630,562 | 3,824,312 | 2,724,213 | 2,216,557 | 2,456,387 |
| Settler's Cove | 968,695 | 1,297,372 | 1,720,858 | 1,348,579 | 1,311,649 | 1,301,415 | 1,323,245 |
| Shadowedge | 868,695 | 1,575,589 | 1,210,611 | 1,100,547 | 1,186,490 | 1,361,138 | 1,408,427 |
| | | | | | | | |
| Total | 14,604,484 | 19,054,172 | 18,659,915 | 18,803,092 | 18,332,439 | 16,850,060 | 16,543,402 |
| Total less Bent Creek | 13,508,591 | 17,655,236 | 10,857,785 | 16,733,323 | 16,504,204 | 15,170,055 | 15,338,450 |
| Total less Bent Creek & CW | 11,575,125 | 14,611,846 | 14,367,499 | 14,839,268 | 14,286,681 | 13,485,180 | 13,789,568 |

% change

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Woodedge | | | -7.74% | 5.68% | | 2.84% | -4.34% | -2.55% |
| Acton Brook | | | 3.75% | -1.49% | | 0.54% | -5.36% | -2.96% |
| Bent Creek | | | -3.33% | -5.04% | | -7.92% | -14.04% | -1.84% |
| Cimarron | | | -0.90% | -1.15% | | -0.23% | -4.14% | -1.58% |
| Creekwood | | | -3.03% | -10.31% | | 3.10% | -20.50% | -4.02% |
| Fountaingate | | | -4.87% | 9.03% | | 3.27% | -7.34% | -0.45% |
| Northwoods | | | -4.79% | 2.34% | | -3.98% | -3.98% | 8.30% |
| Oso Vista | | | 0.61% | 2.17% | | -3.57% | -4.18% | -4.17% |
| Pine Creek & Stony Creek | | | -8.37% | -0.54% | | -8.59% | -18.81% | 10.77% |
| Settler's Cove | | | -4.30% | 2.27% | | 1.33% | 2.30% | 1.04% |
| Shadowedge | | | -2.04% | -3.45% | | 1.17% | -2.91% | -0.09% |
| | | | | | | | |
| Total | | | -2.21% | -0.27% | | -2.02% | -10.16% | 1.15% |
| Total less Bent Creek | | | -2.18% | 0.38% | | -1.37% | -4.84% | 1.17% |
| Total less Bent Creek & CW | | | -1.60% | 3.14% | | -2.10% | -0.25% | 2.25% |

% Change
2002-2006

| | |
|---|---|
| Woodedge | -3.81% |
| Acton Brook | -2.39% |
| Bent Creek | -12.59% |
| Cimarron | -1.20% |
| Creekwood | -24.62% |
| Fountaingate | -0.17% |
| Northwoods | -0.34% |
| Oso Vista | -1.01% |
| Pine Creek & Stony Creek | -26.13% |
| Settler's Cove | 2.12% |
| Shadowedge | -7.13% |
| | |
| Total | -14.59% |
| Total less Bent Creek | -10.90% |
| Total less Bent Creek & CW | -8.04% |

Calculation of PV cushion

Subtract percentage change of Bent Creek from portfolio average
Difference of change in spike by 2002 Revenue of Bent Creek

Discount Rate inputs
AAA Tax-exempt bond rate, 5?                                          4.48%
A Tax-exempt bond rate                                                5.99%

| | | PV | | |
|---|---|---|---|---|
| | | 4.00% | 4.48% | 5.99% |
| Difference | | $9,260,897.76 | $9,228,090.90 | $9,302,573.15 |
| -26.16% | | $10,850,608.48 | $10,434,725.79 | $9,765,120.50 |
| -34.65% | | $11,974,272.42 | $11,422,090.63 | $10,644,358.22 |



# EXHIBIT "L"

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| AHF COMMUNITY DEVELOPMENT, L.L.C., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CAUSE NO. 3-06 CV 1035D ECF |
| CITY OF DALLAS, et al., | § § | |
| Defendants. | § | |

## PLAINTIFF'S SECOND SUPPLEMENTAL RULE 26(a)(2) DISCLOSURE

In accordance with FED. R. CIV. P. Rule 26(e)(1), Plaintiff supplements its prior FED. R. CIV. P. Rule 26(a)(2) disclosures as follows:

### Retained Experts

Steve Coma
BB & T Capital Markets
200 S. College, 7th Floor
Charlotte, North Carolina 28202
Telephone: (704)954-1095

Mr. Coma is the managing director of BB&T Capital Markets. Mr. Coma will offer expert opinions as to the Plaintiff's damages, including the damages the Plaintiff has incurred on its cross-collateralized and cross-defaulted bond at issue in this matter.

Mr. Coma is a retained expert whose written report has been previously provided to Defendants. The data and information relied upon by Mr. Coma is referenced in his report but also includes the Second Amended Complaint and Jury Demand and documents Bates labeled AHF 8765 – AHF 16119 previously produced to the Defendants and document Bates Labeled COM00025 attached hereto

Dated: August 7, 2008.

Respectfully submitted,

John Ben Blanchard, Texas SBN: 02446200
Shawn D. Twing, Texas SBN: 00798008
J. Daren Brown, Texas SBN: 24036271
SPROUSE SHRADER SMITH  P.C.
701 S. Taylor, Suite 500 (79101)
P. O. Box 15008
Amarillo, Texas  79105-5008
Telephone: 806/468-3300
Facsimile:  806/373-3454


J. Daren Brown
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of August, 2008, a true and correct copy of the above and foregoing was sent as shown:

| | |
|---|---|
| Victoria Thomas | Certified Mail, Return Receipt Requested   **X** |
| CITY ATTORNEY'S OFFICE | United States Regular Mail   ☐ |
| 7BN Dallas City Hall | Overnight Mail   ☐ |
| 1500 Marilla Street | Via Facsimile Transmission |
| Dallas, Texas  75201 | Via Hand Delivery   ☐ |
| *Attorney for Defendants* | |

_____

J. Daren Brown

490837_1.DOC
\0567.450


*COM00025*

| Property | 2002 unadjusted Revenue | 2002 Adjusted for Day Count | 2003 Revenue | 2004 Revenue | 2005 Revenue | 2006 Revenue | 2007 Revenue |
|---|---|---|---|---|---|---|---|
| Woodedge | 772,014 | 995,707 | 918,649 | 973,274 | 1,000,957 | 957,781 | 979,285 |
| Aston Brook | 821,552 | 1,059,341 | 1,099,040 | 1,082,638 | 1,088,496 | 1,029,632 | 1,060,570 |
| Bent Creek | 1,507,893 | 2,080,897 | 1,992,158 | 1,875,705 | 1,727,534 | 1,186,379 | 1,204,844 |
| Cimarron | 938,667 | 1,210,848 | 1,192,714 | 1,243,348 | 1,246,723 | 1,135,138 | 1,122,954 |
| Creekwood | 1,831,476 | 2,362,151 | 2,290,295 | 2,054,061 | 2,119,213 | 1,684,510 | 1,548,540 |
| Fountaingate | 1,323,348 | 1,706,792 | 1,622,997 | 1,779,283 | 1,839,316 | 1,703,845 | 1,696,130 |
| Northwoods | 1,520,762 | 1,961,407 | 1,868,199 | 1,910,017 | 1,833,932 | 1,780,250 | 1,892,377 |
| One Willow | 1,704,450 | 2,199,319 | 2,216,878 | 2,285,038 | 2,184,114 | 2,158,428 | 2,088,468 |
| Pine Creek & Stony Creek | 2,348,442 | 3,029,509 | 3,020,583 | 3,004,042 | 2,734,213 | 2,713,387 | 2,608,937 |
| Settler's Cove | 988,075 | 1,274,372 | 1,220,858 | 1,248,579 | 1,271,448 | 1,301,415 | 1,322,240 |
| Shadowridge | 958,005 | 1,235,588 | 1,210,541 | 1,160,547 | 1,186,490 | 1,140,136 | 1,139,427 |
| | | | | | | | |
| Total: | 14,804,464 | 19,094,122 | 18,659,913 | 18,660,092 | 18,232,438 | 16,355,069 | 16,543,432 |
| Total less Bent Creek | 13,296,591 | 17,033,226 | 16,667,755 | 16,733,327 | 16,504,904 | 15,170,690 | 15,338,488 |
| Total less Bent Creek & CW | 11,375,115 | 14,671,085 | 14,377,459 | 14,679,266 | 14,385,691 | 13,486,180 | 13,769,948 |

**% change**

| Property | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| Woodedge | -7.74% | 5.95% | 2.84% | -4.31% | 2.25% |
| Aston Brook | 3.75% | -1.49% | 0.54% | -5.33% | 2.93% |
| Bent Creek | -3.33% | -5.84% | -7.90% | -31.44% | 1.74% |
| Cimarron | -0.90% | 4.15% | -0.23% | -4.14% | -1.86% |
| Creekwood | -3.04% | -10.31% | 3.17% | -20.51% | -8.07% |
| Fountaingate | -4.91% | 9.63% | 3.37% | -7.37% | -0.43% |
| Northwoods | -4.75% | 2.24% | -3.98% | -2.93% | 6.30% |
| One Willow | 0.84% | 2.17% | -3.57% | -1.18% | -4.17% |
| Pine Creek & Stony Creek | -0.27% | -0.54% | -8.99% | -18.83% | 10.77% |
| Settler's Cove | -4.20% | 2.27% | 1.83% | 2.36% | 1.61% |
| Shadowridge | -2.03% | -3.83% | 1.71% | -3.91% | -0.06% |
| | | | | | |
| Total: | -2.27% | -0.27% | -2.02% | -10.30% | 1.15% |
| Total less Bent Creek | -2.15% | 0.39% | -1.37% | -8.08% | 1.11% |
| Total less Bent Creek & CW | -2.00% | 2.10% | -2.00% | -8.25% | 2.25% |

| Property | % Change 2002-2006 | Difference |
|---|---|---|
| Woodedge | -3.81% | |
| Aston Brook | -2.79% | |
| Bent Creek | -42.53% | |
| Cimarron | -1.28% | |
| Creekwood | -28.89% | |
| Fountaingate | -0.17% | |
| Northwoods | -9.24% | |
| One Willow | -1.81% | |
| Pine Creek & Stony Creek | -26.73% | |
| Settler's Cove | 2.12% | |
| Shadowridge | -7.73% | |
| | | |
| Total: | -14.35% | -28.19% |
| Total less Bent Creek | -10.93% | -31.60% |
| Total less Bent Creek & CW | -8.06% | -34.45% |

**Calculation of PV cashflow**

Subtract percentage change of Bent Creek from portfolio average
Difference of change multiplied by 2002 Revenue of Bent Creek

Discount Rate equals:
AAA Tax-exempt bond rate; or    0.0448
A Tax-exempt bond rate          0.0509

| PV | 0.0406 | 0.0448 | 0.0509 |
|---|---|---|---|
| | $9,795,687.76 | $9,328,099.10 | $8,707,573.15 |
| | $10,980,888.46 | $10,455,725.27 | $9,761,120.59 |
| | $11,974,272.12 | $11,402,690.62 | $10,844,158.22 |

# EXHIBIT "M"

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

AHF COMMUNITY          ) (
DEVELOPMENT, L.L.C.    ) (
                       ) (
VS.                    ) (   CASE NO.
                       ) (   3-06CV 1035D
                       ) (
CITY OF DALLAS, ET AL. ) (


- - -

VIDEOTAPED ORAL DEPOSITION

OF

STEPHEN R. COMA

VOLUME 2

- - -


VIDEOTAPED ANSWERS AND DEPOSITION OF STEPHEN R.

COMA, produced as a witness at the instance of the

Defendant, taken in the above-styled and -numbered cause

on the 25th day of September, 2008, at 9:57 a.m., before

Kearby Rives, a Certified Shorthand Reporter in and for

the State of Texas, at American Housing Foundation, 2414

Akard Street, Suite 550, City of Dallas, State of Texas,

in accordance with the Federal Rules of Civil Procedure

and the Agreement hereinafter set forth:

STEPHEN R. COMA -- VOLUME 2

29

1       Q.  And again, sir, as you understand the term

2  damages, that does not include causation, but merely a

3  study of fluctuations in revenue streams?

4       A.  Correct.

5       Q.  Both historic and projected, I assume?

6       A.  Correct.

7       Q.  So this Exhibit 14 does not change the scope of

8  your work as we've discussed it here today?

9       A.  Correct.

10      Q.  Going now to Exhibit 15, am I correct that this

11  is merely a -- an additional table that you prepared,

12  correct?  And I believe we discussed it at length on

13  July 18, 2008.

14      A.  Correct.

15      Q.  And is this table now -- the table in Exhibit

16  15 now incorporated into your report of August 12, 2008,

17  which is an Exhibit 16?

18      A.  Let me confirm, but I believe the answer to

19  that is no.

20      Q.  Okay.

21      A.  Just confirm.   (Witness peruses documents.)

22  No.

23      Q.  And is there a reason why -- well, first of

24  all -- I'll withdraw that.  Is -- even if the table is

25  not incorporated in Exhibit 16A, the August 12, '08,

STEPHEN R. COMA -- VOLUME 2

30

1    report, is the substance or the data in the table,

2    meaning Exhibit 15, incorporated in narrative format in

3    any respect in Exhibit 16A?

4        A.   No.

5        Q.   And why not?

6        A.   Fifteen was prepared for an entirely different

7    purpose than the report for 16, so while --

8        Q.   And -- I'm sorry.

9        A.   So while an accurate representation of what

10   it's supposed to represent, it doesn't apply to 16.

11       Q.   And what does Exhibit 15, the table in Exhibit

12   15, represent?

13       A.   Fifteen -- I'm sorry, and I may have -- just

14   repeat the question just because I may have jumped --

15       Q.   Not at all.  What does the table in Exhibit 15

16   purport to represent?

17       A.   Fifteen were numbers provided by -- and this is

18   the part I always screw up, so I apologize -- Jack

19   Traeger, who is an employee of American Housing -- I see

20   a question mark.

21       Q.   I don't know, sir.

22       A.   -- for purposes of review by BB&T Capital

23   Markets and Goldman Sachs in regards to the total return

24   swap that we had talked --

25       Q.   I'm sorry, total return?

STEPHEN R. COMA -- VOLUME 2

31

1          A.   Swap.

2          Q.   **Swap.**

3          A.   -- that we had reviewed in the last testimony

4     and was not prepared nor is particularly relevant to 16.

5          **Q.   So when you -- and I don't have -- I mean, I**

6     **have your transcript of your July 18th testimony in**

7     **front of me, but I haven't checked it for this purpose.**

8     **But my recollection, and that's all it is, is that when**

9     **you referred to what's now Exhibit 15 back on July 18,**

10    **2008, you referred to it as if it were providing cash**

11    **revenue streams that were relevant to what were then**

12    **your reports in this case, correct?**

13         A.   I too would want to go back and testify -- and

14    apologize in advance if I misled, but this was

15    introduced as an effort to be complete in terms of the

16    information that we're providing, but like I said, was

17    not part of -- certainly bears relationship to, but is

18    not part of the report.

19         **Q.   Or of your analysis in this case, correct?**

20         A.   Correct.

21         **Q.   Okay.  Going now to Exhibit 16, sir, which is**

22    **the Plaintiff's Third Supplemental Rule 26(a)**

23    **Disclosure, with a service date of August 18, 2008, and**

24    **your August 12, 2008, report, which we'll call the third**

25    **report, attached as 16A.  And again, sir, you're**