IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

AHF COMMUNITY DEVELOPMENT,      §
LLC,                            §
                                §
                Plaintiff,      §
                                § Civil Action No. 3:06-CV-1035-D
VS.                             §
                                §
THE CITY OF DALLAS, et al.,     §
                                §
                Defendants.     §

MEMORANDUM OPINION
AND ORDER

Plaintiff AHF Community Development, LLC ("AHF"), a nonprofit organization that provides affordable housing to low and moderate income persons, sues defendant City of Dallas ("City") and certain City officials alleging that they are liable for violating the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-19.  Concluding that a reasonable jury could not find in their favor and that the individual defendants are entitled to qualified immunity, the court grants summary judgment in defendants' favor and dismisses this case with prejudice.

I

In March 2002 AHF acquired several properties through a bond issuance by the Texas State Affordable Housing Corporation, including the Bent Creek Apartments ("Bent Creek") located in the Lake Highlands area of Dallas, Texas.  AHF maintains that the City[1]

---

[1]Unless otherwise indicated or the context otherwise requires, the court refers to the City and the individual defendants collectively as "the City."

engaged in unlawful conduct that triggered a decline in occupancy at Bent Creek and caused AHF to default on its bond indebtedness. AHF also avers that the City's actions were motivated by discriminatory animus toward Bent Creek's residents, who were largely African-American and Hispanic.

In recounting the factual background, the court summarizes the evidence in the light most favorable to AHF as the summary judgment nonmovant and draws all reasonable inferences in its favor. *E.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)). Before AHF acquired Bent Creek in 2002, and for at least some period of time afterward, the complex experienced a high incidence of crime. In November 2004, the City's S.A.F.E. Team ("SAFE Team")[2] opened a file on Bent Creek. The stated mission of the SAFE Team, which is composed of officers from the Dallas Police Department ("DPD") and Building Code and Fire Code Inspectors, is to enlist the cooperation of landowners in abating crime at their properties and to rehabilitate or remove properties that have become havens for criminal activity. A philosophy of the SAFE Team is that properties maintained in compliance with applicable codes are less likely to attract criminal activity.

---

[2]SAFE is an acronym for "Support, Abatement, Forfeiture, Enforcement."

- 2 -

Under the SAFE Team's standard operating procedures, a file may be opened when a property has experienced three or more site-specific instances of abatable criminal activity[3] in the preceding 12 months. During the relevant time frame, defendant DPD Sergeant Preston Gilstrap ("Sgt. Gilstrap") was the commander of the SAFE Team, and defendant DPD Senior Corporal Richard Todd ("Cpl. Todd") was an officer assigned to the Bent Creek SAFE Team case.

The SAFE Team inspected Bent Creek in December 2004, and, in January 2005, met with representatives of AHF and its management company to provide notice of concerns regarding the complex. Subsequent investigations in early 2005 indicated that Bent Creek had corrected Building Code and Fire Code violations but that criminal activity on the premises remained problematic.

In December 2005 a meeting about Bent Creek was convened by the Lake Highlands Area Improvement Association ("LHAIA"), which had become concerned about crime at Bent Creek. LHAIA is composed of Lake Highlands area homeowners' associations. Attendees included representatives of AHF, LHAIA, the Dallas City Attorney's Office, the Dallas Code Compliance Department, DPD, and the Chief of Staff for Dallas City Councilmember Bill Blaydes ("Councilmember Blaydes"), who represented the Lake Highlands area. Attendees

---

[3]In general, abatable criminal activity encompasses offenses that can be eliminated or reduced through reasonable preventive measures, e.g., robbery, murder, and prostitution. *See* Ds. App. 895 (Sgt. Gilstrap Dep.).

discussed strategies for reducing crime at Bent Creek, and interest was expressed in AHF's evicting tenants with criminal histories, imposing a residential curfew, and repairing a security fence, among other measures.

The LHAIA set up another meeting between largely the same individuals and entities on March 1, 2006.  As a result of an agreement reached then, officers from the SAFE Team and the DPD conducted a "community walk" at Bent Creek on March 6 or 7, 2006. Officers visited occupied units to determine whether the persons actually living in each unit were listed on the lease and, if appropriate, to serve criminal trespass notices.

On March 13, 2006 the SAFE Team, along with additional DPD officers, conducted an operation at Bent Creek that is a major focus of the present lawsuit.  The stated purpose of the operation was to conduct Building Code and Fire Code inspections of all Bent Creek units.  The officers and inspectors divided into four five-member teams, each consisting of three officers, one Building Code Inspector, and one Fire Code Inspector.  Of the 318 units inspected, 194 failed, and the City gave Bent Creek a score of zero.

AHF asserts that the City conducted the March 13, 2006 operation as a "raid" designed to search for evidence of "criminals" and criminal activity, harass and intimidate Bent Creek residents and management, and manufacture a file of spurious and

frivolous code violations to use in a nuisance abatement lawsuit intended to secure the condemnation and demolition of Bent Creek. AHF posits that the SAFE Team arrived with an unreasonable number of officers dressed in tactical assault gear, and that the officers engaged in unwarranted and reprehensible behavior.  Specifically, AHF cites evidence that officers banged on doors with tactical batons or flashlights, barged into apartments without giving residents time to get dressed or secure their children, opened cabinets and drawers and examined residents' personal effects, spoke disrespectfully to residents, and threatened with arrest those who complained.  AHF also maintains that the City gave a failing score to a nonexistent apartment unit, and that it cited AHF for inaccurate violations related to maintenance of the swimming pool.

Following the March 13, 2006 operation, AHF filed a complaint with the U.S. Department of Housing and Urban Development ("HUD"). In subsequent communications with AHF, the City indicated that it might file a nuisance abatement lawsuit if code and criminal concerns at Bent Creek were not resolved.  A re-inspection was conducted at Bent Creek in June 2006, and, after several repairs were completed during the inspection, the complex passed.  No further SAFE Team activities have occurred at Bent Creek, but the file remains open.  AHF alleges that SAFE Team activities at Bent Creek have caused occupancy to decline from around 85% to around

- 5 -

50%.

In addition to the foregoing facts, AHF relies on evidence that it maintains demonstrates that the City, LHAIA, and Councilmember Blaydes were cooperating in pursuit of a shared goal to reduce the number of apartments in Lake Highlands and, in particular, to remove Bent Creek. Specifically, AHF relies on evidence of the following. In 2003 LHAIA conducted a "brainstorming session," a survey in which Lake Highlands residents expressed their views about changes in the community. In response to the survey, certain anonymous Lake Highlands residents expressed, *inter alia*, the following concerns about apartments: "influx of minorities," and "increase in number of apartments and residents in terms of ethnic composition." P. App. 141-42. The results of the survey, including the verbatim comments solicited, were posted on LHAIA's website. But the race-based comments were never adopted as an official LHAIA policy or concern. Over the next few years, LHAIA took steps to address the physical deterioration and crime rates at apartments in the area, including the establishment of an apartment relations committee. The President of the LHAIA also frequently contacted AHF to express his concerns about crime at Bent Creek.

Councilmember Blaydes was elected to the Dallas City Council in 2003. Both before and after his election, he vocalized concerns about the large number of apartments in Lake Highlands and

- 6 -

his desire to reduce that number.  He also expressed interest in using a City bond issue to purchase an apartment complex in the vicinity of Bent Creek and convert it to use as a park, library, and courthouse.  AHF maintains that Councilmember Blaydes had Bent Creek in mind.

AHF posits that LHAIA and Councilmember Blaydes recruited the SAFE Team to help them achieve the goal of ridding Lake Highlands of apartments, in general, and of Bent Creek, in particular.  AHF points to an October 2005 email sent from Councilmember Blaydes' Chief of Staff to the DPD Deputy Chief stating that both Councilmember Blaydes and the President of the LHAIA were "exploring the idea" of LHAIA's filing nuisance abatement lawsuits against AHF and another apartment owner, and that "[t]o do so we would need your help - help from SAFE[.]"  P. App. 1203.  AHF maintains that these statements, and the December 2005 and March 2006 meetings, demonstrate that the City shared the goal of removing Bent Creek through a nuisance abatement lawsuit and had adopted the alleged discriminatory animus of LHAIA.

AHF sues the City, Sgt. Gilstrap, and Cpl. Todd.  Although it originally asserted other federal- and state-law claims as well, AHF now seeks relief only based on alleged violations of §§ 3604(a), 3604(b), and 3617 of the FHA.  Defendants move for summary

judgment.[4]   In addition to arguing the merits of AHF's claims, defendants raise preliminary issues of standing and qualified immunity.

II

Because standing is a prerequisite to the exercise of federal jurisdiction, the court turns first to that question. *See Cole v. Gen. Motors. Corp.*, 484 F.3d 717, 721 (5th Cir. 2007).

A

The doctrine of standing addresses the question of who may properly bring suit in federal court.   It "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  To satisfy the case-or-controversy requirement of Article III of the Constitution, the plaintiff must show that it has "suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision."[5]   *Bennett v.*

---

[4]There are other pending motions that the court denies as moot in view of its decision granting summary judgment: AHF's November 14, 2008 motion to exclude expert testimony, the City's November 14, 2008 motion to dismiss, the City's two November 14, 2008 motions to exclude expert testimony, the City's November 14, 2008 motion in limine, AHF's three March 5, 2009 motions for leave to file surreply, and the City's March 25, 2009 motion for leave to file sur-response.

[5]This tripartite test applies to all plaintiffs in federal court, whether individual or organizational. *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999).

*Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  An injury in fact must be "concrete and . . . actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).  Moreover, "the injury must affect the plaintiff in a personal and individual way."  *Id.* at 560 n.1.

In its prudential dimension, standing encompasses "several judicially self-imposed limits on the exercise of federal jurisdiction."  *Allen v. Wright*, 468 U.S. 737, 751 (1984).  These include

> whether a plaintiff's grievance arguably falls within the zone of interests protected by the statutory provision invoked in the suit, whether the complaint raises abstract questions or a generalized grievance more properly addressed by the legislative branch, and whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties.

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 363 (5th Cir. 1999).  Congress may, however, "by legislation, expand standing to the full extent permitted by Art. III," thus proscribing the judicial cognizance of prudential standing considerations.  *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100 (1979); *accord Bennett*, 520 U.S. at 162.  Congress has done so under the FHA.  *See Lincoln v. Case*, 340 F.3d 283, 289 (5th Cir. 2003) ("The Supreme Court has held that the sole requirement for standing under the FHA is the Article III minima.") (citing *Havens*

- 9 -

*Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)).   Therefore, standing under the FHA depends only on the constitutional elements of injury in fact, causation, and redressability.

As the party seeking to invoke federal jurisdiction, AHF bears the burden of proving its standing.   *Lujan*, 504 U.S. at 561.   As will be discussed below, AHF must go beyond the pleadings and designate specific facts demonstrating that there is a genuine issue for trial.   *See infra* § IV; *see also Lujan*, 504 U.S. at 561 ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.").

B

Because Congress has abrogated prudential standing under the FHA, AHF may be able to establish its own standing based on the rights of its tenants to be free from unlawful discrimination. "[A]s long as the plaintiff suffers actual injury as a result of the defendant's conduct, he is permitted to prove that the rights of another were infringed." *Gladstone, Realtors*, 441 U.S. at 103 n.9 (interpreting FHA); *see Warth*, 422 U.S. at 501 ("[P]ersons to whom Congress has granted a right of action . . . may have standing to seek relief on the basis of the legal rights and interests of others[.])"   The City does not dispute this proposition.   It maintains instead that AHF can recover only for its own alleged

- 10 -

injuries, and it asserts that it is unclear whether AHF seeks to recover for its tenants' injuries as well. AHF responds that it can establish standing based on three general categories of injury to itself: (1) deflection of its time and resources in response to, and in anticipation of, the City's allegedly unlawful conduct and to recover its economic loss; (2) stigmatic injury based on the City's alleged characterization of AHF as an absentee and unresponsive landlord; and (3) a multimillion dollar economic loss tied to a decline in occupancy at Bent Creek and AHF's default on its bond indebtedness. The court will consider each category of injury in turn.

1

First, a nonprofit fair housing organization can establish standing under the FHA on the ground that the defendant's challenged unlawful conduct has frustrated its mission and required it to devote significant resources to counteracting the putatively discriminatory effects of that conduct. *Havens Realty*, 455 U.S. at 379; *see also Fair Housing of Marin v. Combs*, 285 F.3d 899, 904-05 (9th Cir. 2002) (holding that fair housing organization had standing under FHA based on frustration of mission and diversion of resources, and collecting similar cases); *Inclusive Communities Project, Inc. v. Tex. Dep't of Housing & Cmty. Affairs*, 2008 WL 5191935, at *4 (N.D. Tex. Dec. 11, 2008) (Fitzwater, C.J.) (same). The court concludes, however, that AHF has failed to establish

injury in fact on this ground.  Initially, to the extent that AHF attempts to rely on the resources that it has expended in pursuing the present lawsuit,[6] these costs do not support standing.  The Fifth Circuit has held that an organization cannot "bootstrap standing" by claiming a drain on its resources as a result of costs incurred for the particular lawsuit in which it asserts standing. *See Ass'n for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994).  Further, although AHF asserts that it has been required to devote its time and resources to respond to the City's alleged discrimination, it has not raised a genuine issue of material fact on this issue.  It has not pointed to evidence of significant, concrete, and identifiable resources that it was required to divert from other uses or any specific projects that it was compelled to forgo as a result of responding to the City's activities.  *Cf. Ass'n of Cmty. Orgs. for Reform Now*, 178 F.3d at 360 (holding that organization failed to establish standing where there was no summary judgment evidence of any "concrete or identifiable resources that [it] could reallocate to other uses" if the defendant ceased its putatively unlawful conduct); *La. ACORN Fair Housing v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000) (holding that organization failed to establish standing where there was no

---

[6]*See* P. Br. 34 (listing as injury in fact "a deflection of its time and resources to obtain injunctive relief to prevent future discriminatory action").

evidence at trial that it was required to put any "specific projects" on hold or "re-double efforts" in response to the defendant's conduct).

2

Second, AHF has failed to establish injury in fact based on its claim of stigmatic injury. Stigmatization based on being labeled as inferior or undesirable due to race represents injury in fact under the FHA. *See*, *e.g.*, *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 208, 212 (1972) (holding that plaintiffs who alleged, *inter alia*, that defendant's discriminatory practices "stigmatized [them] as residents of a white ghetto" had standing (internal quotation marks omitted)); *Smith v. City of Cleveland Heights*, 760 F.2d 720, 722 (6th Cir. 1985) (holding that African-American resident had standing based on stigmatic injury to challenge municipality's racial steering policy). This is rational because eliminating housing discrimination based on race and other protected characteristics goes to the heart of what the FHA seeks to accomplish. *See* 42 U.S.C. § 3601. But AHF cites no authority, and the court has found none, for the proposition that being stigmatized as an absentee or unresponsive landlord—a characterization that is unrelated to any protected trait under the FHA—supports standing under that statute. Accordingly, because AHF's claim of stigmatic injury is not tied to discrimination based on a protected characteristic, the court holds that it cannot serve

as a basis for AHF's standing to assert FHA claims.

3

Third, AHF's asserted economic loss is a type of injury that will support standing. It is well settled that economic loss represents injury in fact. *See, e.g., Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 302 (5th Cir. 2005). And AHF has adduced evidence that creates a genuine issue of material fact regarding whether it has incurred economic loss. Accordingly, the City is not entitled to summary judgment based on the injury in fact element of standing.

C

To satisfy the causation element of standing, AHF must establish that its putative injury is fairly traceable to the City's allegedly unlawful actions. The injury must not be the result of the independent action of some third party not before the court. *Lujan*, 504 U.S. at 560. Neither AHF nor the City discusses causation in terms of standing, but they vigorously dispute in the merits context whether AHF can prove causation, including whether AHF's proffered expert testimony on causation is admissible. The court need not resolve this dispute, however, to determine whether AHF can demonstrate causation for purposes of Article III standing. At this stage of the analysis, although the causal connection "cannot be too speculative, or rely on conjecture about the behavior of other parties, [it] need not be so airtight . . . as to

demonstrate that [AHF] would succeed on the merits." *Coal. for a Sustainable Delta v. Carlson*, 2008 WL 2899725, at *5 (E.D. Cal. July 24, 2008) (internal quotation marks omitted) (quoting *Ocean Advocates v. U.S. Army Corp of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2005)); *see also Hanson v. Veterans Admin.*, 800 F.2d 1381, 1385 (5th Cir. 1986) ("It is inappropriate for the court to focus on the merits of the case when considering the issue of standing.   In examining the causation element of standing, the question to be asked is whether the line of causation between [the plaintiff's] injury and [the defendant's conduct] is too attenuated." (internal quotation marks and citation omitted)).   AHF has proffered sufficient evidence to create a genuine issue of material fact regarding whether its economic loss is fairly traceable to the City (i.e., evidence of occupancy decline during the time the SAFE Team was active at Bent Creek) without requiring speculation regarding the independent actions of third parties not before the court. *Cf. Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 321 (5th Cir. 2002) (holding that plaintiff drug purchasers lacked standing to sue drug manufacturer in part because causation depended on "independent medical judgment" of plaintiffs' physicians).   Accordingly, the City is not entitled to summary judgment based on the causation element of standing.

D

Finally, AHF must establish that it is likely, as opposed to merely speculative, that its injury will be redressed by a favorable decision. *See Lujan*, 504 U.S. at 561. AHF has created a genuine issue of material fact regarding whether the damages it seeks will redress its economic loss.

AHF also seeks injunctive relief. Specifically, AHF requests an injunction against further "harassing conduct" by the City, e.g., future "raids," citations for alleged frivolous code violations, and threats of possible lawsuits. 2d Am. Compl. ¶ 141. To establish standing to obtain injunctive relief, "a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)). Because the SAFE Team file on Bent Creek remains open and the City in its briefing has not unequivocally negated any intent to continue to enforce the Building and Fire Codes at Bent Creek, AHF has created a genuine issue of material fact regarding whether it is likely rather than speculative that the SAFE Team will take future actions at Bent Creek that AHF would consider to be harassing. Therefore, the City is not entitled to summary judgment based on the redressability element of standing.

- 16 -

III

Having determined that this case cannot be dismissed for lack of standing, the court considers whether Sgt. Gilstrap and Cpl. Todd are entitled to qualified immunity.

A

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To decide whether defendants are entitled to qualified immunity, the court must first answer the threshold question whether, taken in the light most favorable to plaintiffs as the parties asserting the injuries, the facts they have alleged show that defendants' conduct violated a constitutional right." *Ellis v. Crawford*, 2005 WL 525406, at *3 (N.D. Tex. Mar. 3, 2005) (Fitzwater, J.) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This

must be the initial inquiry.")).[7]  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* "Even if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable." *Wallace v. County of Comal*, 400 F.3d 284, 289 (5th Cir. 2005). "The objective reasonableness of allegedly illegal conduct is assessed in light of the legal rules clearly established at the time it was taken." *Salas v. Carpenter*, 980 F.2d 299, 310 (5th Cir. 1992) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). "'The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct

---

[7]The Supreme Court recently held that *Saucier*'s two-step procedure for determining qualified immunity is no longer mandatory. *See Pearson v. Callahan*, ___ U.S. ___, 129 S.Ct. 808, 818 (2009). Specifically, courts are free to consider *Saucier*'s second prong without first deciding whether the facts show a constitutional violation. *Id.* The "decision does not prevent the lower courts from following the *Saucier* procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases." *Id.* at 821. The court in its discretion has decided to follow the procedure of *Saucier* in this case.

violated the' plaintiff's asserted constitutional or federal statutory right." *Cozzo v. Tangipahoa Parish Council-President Gov't*, 279 F.3d 273, 284 (5th Cir. 2002) (quoting *Thompson v. Upshur County, Tex.*, 245 F.3d 447, 457 (5th Cir. 2001)).

B

For the reasons explained below, a reasonable jury could not find that AHF is entitled to recover on the merits of its claims under §§ 3604(a), 3604(b), and 3617 of the FHA.  It therefore follows that Sgt. Gilstrap and Cpl. Todd are entitled to qualified immunity on these claims.

The court now turns to the merits of AHF's claims.[8]

IV

The FHA, enacted as Title VIII of the Civil Rights Act of 1968 and subsequently amended, "implements the Congressional policy favoring the achievement of integrated living patterns." *Hallmark Developers, Inc. v. Fulton County, Ga.*, 2004 WL 5492706, at *11 (N.D. Ga. Sept. 27, 2004) (citing *Trafficante*, 409 U.S. at 211). AHF asserts claims under three provisions of the FHA: § 3604(a) (making it unlawful to discriminate in making available a

---

[8]In AHF's second amended complaint, it also asserts claims for violations of federal civil rights and state law against the City.  The City moved for summary judgment on these claims in addition to the FHA claims, and filed a separate motion to dismiss these claims.  But after it had done so, AHF voluntarily dismissed all but its FHA claims.  Accordingly, the court denies as moot the City's summary judgment motion on AHF's federal civil rights and state-law claims and the City's motion to dismiss the state-law claims.  *See supra* note 4.

dwelling); § 3604(b) (making it unlawful to discriminate in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith); and § 3617 (making it unlawful to coerce, intimidate, threaten, or interfere with a person based on his aiding or encouraging another in the exercise or enjoyment of fair housing rights).

In addition to showing the elements of the applicable statutory provision, a plaintiff who seeks to recover under the FHA must also prove a theory of discrimination. Like plaintiffs alleging employment discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, FHA plaintiffs must prove either (1) that the defendant acted with discriminatory intent (disparate treatment theory), or (2) that the defendant's policy, procedure, or practice resulted in a significant discriminatory effect (disparate impact theory). *See Simms v. First Gibralter Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996) (analyzing plaintiff's FHA claims under both discriminatory intent and discriminatory effect theories); *Hanson*, 800 F.2d at 1386 ("[A] violation of [§ 3604] may be established not only by proof of discriminatory intent, but also by a showing of a significant discriminatory effect.") (current codification of statutory provision shown in brackets)). AHF asserts both disparate treatment and disparate impact theories of discrimination. It

maintains that the City's actions were motivated by discriminatory intent toward, and had a discriminatory effect on, its tenants based on their race or familial status, i.e., families with minor children.

Because AHF will bear the burden at trial on its FHA claims, the City can obtain summary judgment by pointing the court to the absence of evidence of an essential element of the claim in question.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once it does so, AHF must go beyond its pleadings and designate specific facts demonstrating that there is a genuine issue for trial.  *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  An issue is genuine if the evidence is such that a reasonable jury could return a verdict for AHF.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  AHF's failure to produce proof as to any essential element renders all other facts immaterial.  *See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.).  Summary judgment is mandatory if AHF fails to meet this burden.  *See Little*, 37 F.3d at 1076.

V

The court first addresses AHF's disparate treatment theory. Before deciding whether AHF can prove discriminatory intent, the court must consider whether AHF can satisfy the elements of any of the FHA provisions on which it relies.

- 21 -

A

Section 3604(a) makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."  Because the City neither owned nor managed Bent Creek, the crux of the parties' dispute is whether the City's actions with respect to Bent Creek "otherwise ma[de] unavailable or den[ied]" units at the complex based on race or familial status.  In arguing this issue, the City relies on, and AHF attempts to distinguish, *Cox v. City of Dallas, Texas*, 430 F.3d 734 (5th Cir. 2005).

B

The *Cox* plaintiffs, homeowners in a predominantly African-American neighborhood, argued that the City of Dallas ("Dallas") failed to police illegal dumping at a site in their neighborhood, thus diminishing the value of their properties.  The question presented was whether Dallas' alleged omissions violated § 3604(a) by "otherwise mak[ing] unavailable or deny[ing]" housing to the plaintiffs.  Initially, the court noted that, although the scope of the phrase "otherwise make unavailable or deny" may seem "all-encompassing," it is not "limitless."  *Id.* at 740.  Reviewing pertinent case law, the panel concluded that § 3604(a) was concerned with access to or availability of housing, and that the

plaintiffs' allegations did not fall within the ambit of that provision. *Id.* at 740-41. "[T]he simple language of § 3604(a) does not apply to current homeowners whose complaint is that the value or 'habitability' of their houses has decreased because such a complaint is not about 'availability.'" *Id.* at 741. Further, the court agreed with the Seventh Circuit's analysis of the purpose of the FHA, as demonstrated in the statute's legislative history:

> The [FHA] contains no hint either in its language or its legislative history of a concern with anything but access to housing . . . . Since the focus [of Congress] was on [minorities'] exclusion, the problem of how they were treated when they were included, that is, when they were allowed to own or rent homes in [desirable residential] areas, was not at the forefront of congressional thinking.  That problem——the problem not of exclusion but of expulsion——would become acute only when the law forced unwanted associations that might provoke efforts at harassment, and so it would tend not to arise until the [FHA] was enacted and enforced.  There is nothing to suggest that Congress was trying to solve that future problem, an endeavor that would have required careful drafting in order to make sure that quarrels between neighbors did not become a routine basis for federal litigation.

*Id.* (quoting *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 329 (7th Cir. 2004) (fourth alteration added)).

C

In the present case, AHF maintains that its allegations, unlike those of the *Cox* plaintiffs, implicate the availability of housing.  Specifically, AHF contends that the City, acting in

conjunction with the LHAIA and Councilmember Blaydes, developed a plan to eliminate thousands of apartment units in Lake Highlands and sought in particular to remove Bent Creek by harassing its owners, management, and residents and by compiling a file of code violations for use in a nuisance abatement lawsuit. AHF maintains that a reduction in the number of apartment units would make housing unavailable to African-Americans because they are more likely than Caucasians to reside in apartments.[9]  Further, AHF contends that the City's actions, culminating in the March 13, 2006 "raid" at the property, caused occupancy to decline.

The City counters that AHF's claims concern only the habitability of units at Bent Creek and not their availability, and therefore do not support a § 3604(a) claim.  The City maintains that a mere nebulous plan or desire to reduce the number of apartment units in Lake Highlands does not constitute making unavailable or denying housing within the meaning of § 3604(a). Moreover, the City argues, in an area like Lake Highlands with an abundance of multifamily housing, even a reduction in the number of apartment units would not fall within the ambit of the statutory provision absent evidence that housing was made unavailable or

_____

[9]Additionally, AHF notes that Councilmember Blaydes allegedly secured the removal from Lake Highlands of 3,000 apartment units, none of which was at Bent Creek.  To the extent that AHF seeks to assert that such removal supports its § 3604(a) claim, it lacks standing to do so.  There is no genuine issue of material fact that AHF has suffered no injury from the alleged elimination of apartment units that it does not own.  *See supra* § II(B).

denied to a protected class member.  And the City contends that AHF
has produced no evidence that any person decided to move from Bent
Creek, or opted not to move in, because of the City's actions.

D

The court concludes that a reasonable jury could not find that
AHF's   §   3604(a)   claim   implicates   concerns   related   to   the
availability   of   housing.     The   City   is   therefore   entitled   to
summary judgment dismissing this claim.

In essence, AHF suggests two theories for asserting that the
City has made housing unavailable to Bent Creek residents: (1) by
harassing   and   intimidating   them   under   the   guise   of   code
enforcement,   thereby   prompting   them   to   leave   in   substantial
numbers, and (2) by having a plan or goal of removing Bent Creek
through a nuisance abatement lawsuit.

1

AHF's   first   theory   amounts   to   an   argument   of   constructive
eviction: that the actions of the City with respect to Bent Creek,
especially the March 13, 2006 "raid," so negatively affected the
quality   of   life   at   Bent   Creek   that   it   effectively   compelled
residents to move out.  A reasonable jury could not find in AHF's
favor on this theory.

As   a   threshold   matter,   it   is   questionable   whether   a
constructive   eviction-type   claim   is   even   cognizable   under
§ 3604(a).  In *Cox* the Fifth Circuit expressly declined to reach

this question.  *See Cox*, 430 F.3d at 742 n.21 ("We realize that a § 3604(a) claim for 'constructive eviction' would be a type of 'habitability' claim—that the 'habitability' has so decreased that continued residency is not objectively reasonable.  We reject only those 'habitability' claims that fall short of constructive eviction, leaving the question of constructive eviction for another day.").  The Seventh Circuit in *Halprin* voiced concern about the viability of a constructive eviction theory.  *See Halprin*, 388 F.3d at 329 (noting that "[a]s a purely semantic matter the statutory language [of § 3604(a)] might be stretched far enough to reach a case of 'constructive eviction,'" but stressing that the FHA focuses on "exclusion" rather than "expulsion").

Nonetheless, even assuming that constructive eviction is a viable theory, AHF has not adduced evidence of actions by the City that would rise to the level of rendering continued residence at Bent Creek objectively unreasonable.  *Clifton Terrace Associates, Ltd. v. United Technologies Corp.*, 929 F.2d 714 (D.C. Cir. 1991), a case that the Fifth Circuit cited in *Cox*, illustrates the type of conduct necessary to amount to constructive eviction.  In *Clifton Terrace* the D.C. Circuit noted that "the denial of certain essential services relating to a dwelling, such as mortgage financing, sewer hookups, zoning approval, or basic utilities, might result in the denial of housing." *Id.* at 719-20.  As a further example, a municipality's decision to shut off the water

- 26 -

supply for a significant time to a predominantly African-American neighborhood would amount to constructive eviction.

By contrast, AHF has demonstrated only that the SAFE Team conducted a few code enforcement inspections of Bent Creek during 2004 and 2005, and two operations there in 2006: a March 6 or 7 "community walk" by officers from the SAFE Team and the DPD, and a March 13 code enforcement inspection that AHF characterizes a "raid."  In general, code enforcement inspections are designed to improve the quality of life for those who dwell in multifamily housing by ensuring that minimum health and safety standards are met.  Thus absent evidence to the contrary, conducting regular code enforcement inspections would not of itself raise an inference of attempted constructive eviction.

Here, it is only with reference to the March 13, 2006 operation that AHF offers any proof of inappropriate behavior by the SAFE Team or DPD officers toward Bent Creek residents.  But even assuming that certain SAFE Team members or DPD officers treated residents in an overbearing, obnoxious, and/or disrespectful manner during this operation, a reasonable jury could not find that this conduct amounts to a constructive eviction. This one-time incident is significantly less detrimental to the quality of life than is the chronic denial of essential services, such as sewer or basic utilities.  And even if the court assumes *arguendo* that a second occurrence of such police conduct *would* have

been sufficient to support a constructive eviction claim——on the theory that minority residents would see it as the beginning of a pattern of harassment and begin vacating the premises——only one such "raid" occurred at Bent Creek.  If incidents that merely made a residence less desirable could amount to a constructive eviction, the distinction between habitability and availability of housing would be materially blurred if not erased entirely.  AHF has identified no case, and the court has found none, that suggests that an incident such as the March 13, 2006 operation would itself support a claim for making unavailable or denying housing under § 3604(a).  Accordingly, even assuming that constructive eviction is actionable under § 3604(a), a reasonable jury could not find that any actions by the City rose to this level.

2

        AHF's second ground for its contention that the City made unavailable or denied housing within the meaning of § 3604(a) is that the City, in collaboration with the LHAIA and Councilmember Blaydes, had developed a plan or intent of removing Bent Creek through a nuisance abatement lawsuit.  Having a plan or intent, of course, is not the same as accomplishing it.  This distinction is critical to the viability of AHF's § 3604(a) claim.  Bent Creek has been neither demolished nor condemned, and there is no evidence that the City has filed a lawsuit to accomplish this purpose.  Thus no units at Bent Creek have in fact been made unavailable or denied

to any person.   AHF has cited no case, and the court has found
none, that supports the proposition that an inchoate plan or intent
to remove housing amounts to denying or making housing unavailable
within the meaning of § 3604(a).   The court recognizes that housing
need not be literally made unavailable——e.g., the building need not
be demolished or guards posted at doors to bar entry——before a
§ 3604(a) claim can arise.   But the conduct on which AHF relies
does not come close enough to actually preventing people from
living at Bent Creek to support a claim for making housing
unavailable.[10]   *Cf. 2922 Sherman Ave. Tenants' Ass'n v. District of
Columbia*, 444 F.3d 673, 685 (D.C. Cir. 2006) (holding that
municipality made apartment units unavailable under § 3604(a) by
placarding them with notices of closure and warnings that buildings
were unfit for human habitation).   Before Bent Creek can be
involuntarily demolished, the City must succeed in a nuisance
abatement lawsuit or pursue some other available legal mechanism to
have the property condemned.   Any such method would involve due
process and a consideration of AHF's rights.

   Accordingly, the City is entitled to summary judgment

---

   [10]AHF cites two cases in support of a broader reading of the
phrase "otherwise make unavailable or deny."   *See Nationwide Mut.
Ins. Co. v. Cisneros*, 52 F.3d 1351, 1357 (6th Cir. 1995), and *Eva
v. Midwest Nat'l Mortgage Banc, Inc.*, 143 F.Supp.2d 862, 882-86
(N.D. Ohio 2001).   Neither of these cases is factually analogous.
Moreover, to the extent that either interprets § 3604(a) to
encompass practices that do not affect the availability of housing,
they conflict with *Cox*, which is binding on this court.

dismissing AHF's § 3604(a) claim.

VI

Based on similar reasoning, the court holds that the City is entitled to summary judgment dismissing AHF's § 3604(b) claim.

Section 3604(b) prohibits discrimination in "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." In *Cox* the Fifth Circuit addressed this provision as well.  The panel held that the phrase "in connection therewith" refers to the *sale or rental* of a dwelling rather than to the dwelling itself. *Cox*, 430 F.3d at 745.  This reading of the provision aligns its focus with that of § 3604(a)——on the availability and acquisition, rather than on the habitability and enjoyment, of property.  *Id.*; *see also id.* at 746 ("Although the FHA is meant to have a broad reach, unmooring the 'services' language from the "'sale or rental' language pushes the FHA into a general anti-discrimination pose, creating rights for any discriminatory act which impacts property values[.]").

Here, there is no claim that Bent Creek or its units were being sold.  And so far as the rental of Bent Creek units is concerned, the City could have not discriminated in the terms, conditions, or privileges of the rental of a unit, or in the provision of services or facilities in connection with the rental of a unit at Bent Creek, because Bent Creek, not the City, rented

these units.   The City's challenged conduct therefore no more
implicates availability concerns under § 3604(b) than it does under
§ 3604(a).   In order for AHF's theory to be viable, the reach of
§ 3604(b) would have to be enlarged to cover conduct that makes a
rented dwelling less habitable and enjoyable, even if not
unavailable.   Because § 3604(b) does not reach this far, the City
is entitled to summary judgment dismissing AHF's § 3604(b) claim.

                              VII

     The court next considers AHF's § 3617 claim.

                               A

     Section 3617 provides:

          It shall be unlawful to coerce, intimidate,
          threaten, or interfere with any person in the
          exercise or enjoyment of, or on account of his
          having exercised or enjoyed, or on account of
          his having aided or encouraged any other
          person in the exercise or enjoyment of, any
          right granted or protected by section 3603,
          3604, 3605, or 3606 of this title.

AHF maintains that it aided its tenants (the majority of whom were
either racial minorities or families) in the exercise of their fair
housing rights by providing them housing, and that the City's
conduct, particularly during the March 13, 2006 "raid," amounted to
harassment, intimidation, and interference on account of that aid
or encouragement.   The City maintains that AHF cannot pursue a
§ 3617 claim unless it proves a predicate violation of §§ 3604(a)
or (b).

                             - 31 -

B

Although in *Cox* the Fifth Circuit did not address § 3617, its conclusion that the FHA is concerned with discrimination in the acquisition of housing (with the possible exception of post-acquisition discrimination through constructive eviction) is relevant to an analysis of the scope of § 3617. Specifically, the reasoning of *Cox* suggests that § 3617 is concerned with retaliatory acts that affect the availability, rather than the mere enjoyment, of property. This conclusion is consistent with the language of § 3617, which ties protection against retaliation to a person's exercise or enjoyment of any right granted or protected by § 3604 or one of the other enumerated sections. Based on this explicit statutory link, the Seventh Circuit in *Halprin*, a decision that the *Cox* court generally found persuasive, questioned whether § 3617 should apply where a violation of § 3604 had not itself been shown.[11] Further, in two recent unpublished decisions, the Fifth

_____

[11]Specifically, the *Halprin* court noted that HUD has issued a regulation that interpreted § 3617 to extend to retaliatory actions that interfered with a person's post-acquisition enjoyment of a dwelling. *Halprin*, 388 F.3d at 330 ("The regulation cuts section 3617 loose from section 3604, contrary to the language of section 3617. Interference with 'enjoyment of a dwelling,' forbidden by the regulation, is something that can take place after the dwelling has been acquired, though we know that section 3604 is not addressed to post-acquisition discrimination."). A district court in this circuit, relying on *Halprin*, recently concluded that the regulation was invalid. *Reule v. Sherwood Valley I Council of Co-Owners, Inc.*, 2005 WL 2669480, at *4 n.4 (S.D. Tex. Oct. 19, 2005), *aff'd*, 235 Fed. Appx. 227 (5th Cir. 2007) (per curiam). The court need not address the validity of this regulation, however, because neither party has addressed it.

- 32 -

Circuit has suggested that it, too, sees a connection between the scope of §§ 3604 and 3617.  In *Reule v. Sherwood Valley I Council of Co-Owners, Inc.*, 235 Fed. Appx. 227, 227-28 (5th Cir. 2007) (per curiam), the court cited *Cox* and *Halprin* to conclude that the plaintiff's claims under both § 3604 and § 3617 must "fail because they go to the habitability of her condominium and not the availability of housing," *id.*  Similarly, in *McZeal v. Ocwen Financial Corp.*, 252 F.3d 1355 (5th Cir. 2001) (per curiam) (unpublished table decision), the Fifth Circuit stated: "[b]ecause his § 3605 claim fails, [plaintiff's] claim under § 3617 must also fail," *id.* at *2.  Accordingly, the court holds that § 3617 applies only to conduct that implicates the availability of housing rather than merely habitability.  In other words, to be actionable under § 3617, the defendant's conduct must make housing unavailable, not merely less habitable.

Here, even assuming that certain actions by the City could be considered in some respect harassing or intimidating, they did not rise to the level of denying housing to any resident of Bent Creek or of interfering with AHF's ability to make housing available at Bent Creek.[12]  As discussed above, the City's conduct did not amount

_____

[12]To support its § 3617 claim, AHF relies on a district court decision from the Eastern District of Virginia that involved similar facts.  In *People Helpers, Inc. v. City of Richmond*, 789 F.Supp. 725 (E.D. Va. 1992), the court considered whether the plaintiff nonprofit organization, which rented apartments to minorities and disabled persons, could maintain a § 3617 claim against the city for harassing actions, including allegedly

- 33 -

to a constructive eviction of any Bent Creek resident.  And even assuming that the City had a plan or intent to remove Bent Creek through condemnation and demolition, this does not alone make housing unavailable.

Accordingly, the City is entitled to summary judgment dismissing AHF's § 3617 claim.

VIII

The court now turns to AHF's disparate impact theory.

A

As noted above, FHA plaintiffs, like Title VII plaintiffs, can establish liability on a showing of discriminatory effect without discriminatory intent.  In the Title VII context, the Fifth Circuit has articulated the following elements of a prima facie case of disparate impact discrimination: "a plaintiff must (1) *identify* the challenged . . . practice or policy, and pinpoint the defendant's use of it; (2) demonstrate a disparate *impact* on a group that falls within the protective ambit of [the statute]; and (3) demonstrate a *causal relationship* between the identified practice and the disparate impact.  *Gonzales v. City of New Braunfels, Tex.*, 176

―――――――――――――

baseless code investigations and threats of criminal prosecution, that the organization maintained were designed to drive away its residents.  *Id.* at 727-30, 733.  The court held that there was a genuine issue of material fact regarding whether the city's conduct amounted to "interference" or "intimidation" within the meaning of the statute.  *Id.* at 733.  *People Helpers* is not binding authority, of course, and, to the extent it extends § 3617 to interference with the enjoyment of property absent availability concerns, the court respectfully declines to follow it.

F.3d 834, 839 n.26 (5th Cir. 1999). The court has also noted that disparate impact plaintiffs "must engage in a 'systematic analysis' of the policy or practice," and "[i]n doing so, they 'must, of necessity, rely heavily on statistical proof.'" *Frank v. Xerox Corp.*, 347 F.3d 130, 135 (5th Cir. 2003) (quoting *Muñoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 1999)). "Once the plaintiff has made out a prima facie case of discriminatory effect . . . the burden shifts to the defendant to prove a compelling government interest." *Dews v. Town of Sunnyvale, Tex.*, 109 F.Supp.2d 526, 532 (N.D. Tex. 2000 (Buchmeyer, C.J.) (FHA case).

B

To the extent AHF seeks to rely on the actions of the City with respect to Bent Creek as the basis of its disparate impact theory,[13] it cannot succeed for two reasons. First, as discussed above, these actions do not implicate concerns related to the availability of housing and therefore do not come within the statutory terms of §§ 3604(a), 3604(b), or 3617. Second, these specific actions cannot be a ground of disparate impact liability. Rather, AHF must point to more widespread policies, procedures, or

---

[13]In its briefing regarding disparate impact, AHF alleges the following specific actions of the City: (1) "the City's interference with AHF's provision of housing to low to moderate income families by enforcing the demands of private citizens in attempting to remove low to moderate income housing from the area through the misuse of nuisance laws"; (2) "the use of coercion, intimidation, threats, or interference by the [DPD] and SAFE Team in response to the demands and threats of LHAIA." P. Br. 33.

practices of the City that disproportionately affect racial minorities or families with children. *See Simms*, 83 F.3d at 1555 ("The relevant question in a discriminatory effects claim . . . is not whether a single act or decision by that defendant has a significantly greater impact on members of a protected class, but instead the question is whether a policy, procedure, or practice specifically identified by the plaintiff has a significantly greater discriminatory impact on members of a protected class."). The court will therefore consider whether AHF can establish a disparate impact resulting from a policy, procedure, or practice of the City.

C

1

AHF first maintains that it need not establish a prima facie case of disparate impact discrimination because one of the City's expert witnesses has conceded its existence, thereby placing the burden on the City to establish a compelling governmental interest. The court rejects this contention. Even assuming that the expert in fact made such a concession——which the City disputes——the unadorned legal conclusion of an expert that a party has established a prima facie case of disparate impact discrimination is not admissible. *See Snap-Drape, Inc. v. Comm'r of Internal Revenue*, 98 F.3d 194, 198 (5th Cir. 1996) (holding expert testimony inadmissible under Fed. R. Evid. 704(a) because "[w]e have

repeatedly held that this rule does not allow an expert to render conclusions of law").

2

AHF attempts second to identify putative policies, procedures or practices of the City that have a disparate impact.  It recites: (1) "the misuse of building and fire codes and nuisance abatement laws to perform improper searches of residences under the guise of code enforcement"; (2) "the misuse of building and fire codes and nuisance laws to impose greater duties on property owners than is required by law"; (3) "the enforcement of building and fire codes and nuisance laws without regard for the provisions of the [FHA]"; and (4) "a conscious decision by [Councilmember Blaydes] to remove 10,000 multi-tenant units in the Lake Highlands area with a conscious disregard for the displacement of low-to-moderate income families."  P. Br. 33-34.

The court concludes that a reasonable jury could not find in AHF's favor on its disparate impact theory.  First, the court disregards the alleged desire of Councilmember Blaydes to remove apartment units in Lake Highlands.  Even if true, a reasonable jury could not find that the desire of a single city councilmember amounted to a policy, procedure, or practice of the City.  Second, the other alleged policies all relate to the City's alleged misuse of the Building Code, Fire Code, and nuisance laws.  Even assuming that this alleged misuse is widespread such that it could be

considered a policy, procedure, or practice (rather than limited to the City's actions at Bent Creek), AHF has not demonstrated that it relates to the availability of housing, i.e., that it amounts to constructive eviction.    Third, AHF has failed to designate statistical evidence that shows that this alleged misuse has a disproportionate effect on the availability of housing for racial minorities or families with children as opposed to Caucasian or single individuals.[14]    Thus a reasonable jury could not find in AHF's favor, and the City is entitled to summary judgment dismissing AHF's disparate impact theory.

_____

[14]The City devotes a considerable part of its opening brief regarding the disparate impact claim to critiquing the putative statistical analysis of one of AHF's designated experts, Dr. Gary Lacefield ("Dr. Lacefield").   In response, however, AHF does not rely on, or even refer to, any of Dr. Lacefield's opinions. Accordingly, the court declines to comb through Dr. Lacefield's expert report to determine whether he proffers any statistical analysis that could support AHF's disparate impact claim.   *See, e.g., Arrieta v. Yellow Transp., Inc.*, 2008 WL 5220569, at *2 n.3 (N.D. Tex. Dec. 12, 2008) (Fitzwater, C.J.) ("It is well settled that the court is not obligated to comb the record in search of evidence that will permit a nonmovant to survive summary judgment." (citing *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006)).

*       *       *

Accordingly, for the reasons explained, as to AHF's remaining claims under the FHA, the court grants the City's November 14, 2008 motion for summary judgment, grants Sgt. Gilstrap and Cpl. Todd's November 14, 2008 motion for summary judgment, and dismisses this lawsuit with prejudice by judgment filed today.

**SO ORDERED.**

June 11, 2009.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE